# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Ulm v. Memorial Medical Center*, 2012 IL App (4th) 110421

---

| | |
|---|---|
| Appellate Court Caption | JANET ULM, Plaintiff-Appellant, v. MEMORIAL MEDICAL CENTER, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-11-0421 |
| Argued | December 13, 2011 |
| Filed | January 6, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from plaintiff's discharge from her position as a manager at defendant hospital, the trial court properly entered summary judgment for the hospital on her allegations of retaliatory discharge, a violation of the Whistleblower Act, intentional infliction of emotional distress, negligent infliction of emotional distress and negligent supervision and training, since plaintiff's discharge could not have violated any clearly mandated public policy, she failed to cite any law she would have violated by performing her job of certifying that the subpoenaed medical records she managed were complete, accurate and made in the regular course of the hospital's business, defendant's alleged conduct was not "extreme and outrageous," and the claims of negligent infliction of emotional distress and negligent supervision were preempted by the Workers' Compensation Act. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 07-L-74; the Hon. Peter C. Cavanagh, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|
| Counsel on Appeal | John C. Kreamer (argued) and Susan J. Best, both of Best, Vanderlaan & Harrington, of Chicago, for appellant. |
| | John A. Kauerauf (argued), of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for appellee. |
| Panel | JUSTICE COOK delivered the judgment of the court, with opinion. Justices Steigmann and Pope concurred in the judgment and opinion. |

**OPINION**

¶ 1     In March 2007, plaintiff Janet Ulm sued her former employer, defendant Memorial Medical Center, alleging (1) retaliatory discharge, (2) violation of the Whistleblower Act (740 ILCS 174/1 through 35 (West 2006)), (3) intentional infliction of emotional distress, (4) negligent infliction of emotional distress, and (5) negligent supervision and training. In May 2011, the trial court granted defendant's motion for summary judgment on all counts. Plaintiff appeals, arguing summary judgment was inappropriate. We disagree and affirm.

¶ 2                                  I. BACKGROUND

¶ 3     Plaintiff worked for defendant, a hospital in Springfield, for about 23 years until she was discharged on June 21, 2006. At the time of her firing, plaintiff had been employed for some time as operations manager of defendant's health information management department. Plaintiff's department was responsible for, among other things, maintaining patients' medical records and releasing them when subpoenaed or requested by an authorized party.

¶ 4     When the health information management department released a record under subpoena, it was customary for an employee within the department to include with the record a certification stating the record was complete and accurate and had been prepared in the regular course of defendant's business. For some time, the department's director was responsible for certifying these medical records for release. When defendant fired the director in 2005, plaintiff assumed this responsibility.

¶ 5     Sometime in 2005, plaintiff was made responsible for ensuring the practices of the health information management department complied with the standards of the Joint Commission on Accreditation of Hospitals Organization, through which defendant was accredited. This required plaintiff to become familiar with the accreditation standards and legal regulations

pertaining to the department's activities.

¶ 6    In September 2005, defendant implemented a new electronic system for preparing and storing medical records. Plaintiff became concerned that the electronic system was noncompliant with legal and accreditation standards in several respects. She believed the noncompliance jeopardized the accuracy and confidentiality of defendant's medical records and exposed defendant to potential criminal penalties and loss of its accreditation. In a meeting with her supervisor, defendant's senior vice president Kerra Guffey, plaintiff refused to continue certifying the subpoenaed medical records, fearing she could no longer certify them in accordance with the law. Although plaintiff's refusal allegedly angered Guffey, Guffey agreed to undertake certifying the records herself.

¶ 7    Following her meeting with Guffey, according to plaintiff, defendant began retaliating against plaintiff. According to plaintiff, retaliatory actions taken against plaintiff included adding to her responsibilities tasks that had been previously assigned to lower-level employees, relocating plaintiff to a less desirable office, subjecting her to ridicule, Guffey's discussing plaintiff's job performance with other employees and giving the impression that plaintiff was at risk of being fired, negatively reviewing plaintiff's job performance–particularly her supervision of subordinate employees–for the first time in her 23 years' employment with defendant, reassigning plaintiff's secretary to other responsibilities, and failing to offer plaintiff "support" in completing her duties.

¶ 8    In the spring of 2006, plaintiff was asked to prepare the health information management department for an upcoming inspection by the Joint Commission on Accreditation of Hospitals Organization. Plaintiff again expressed concerns to Guffey and other supervisors regarding the suspected noncompliance of defendant's record-keeping system with accreditation standards and state laws. When these supervisors "failed to respond" to plaintiff's concerns, on June 20, 2006, plaintiff complained to defendant's vice president of quality control, Jim Bente, about the perceived compliance issues and her supervisors' apparent disinterest in addressing plaintiff's concerns. She reiterated that she felt defendant was at risk of losing its accreditation. Bente agreed to schedule a meeting at which plaintiff and her supervisors could discuss their various concerns.

¶ 9    On June 21, 2006, Bente circulated an e-mail confirming that a meeting had been scheduled. Within an hour of receiving this confirmation, plaintiff received an e-mail notifying her that the meeting had been canceled. In a meeting with Guffey and another manager that day, plaintiff was fired.

¶ 10   In March 2007, plaintiff filed her five-count complaint against defendant, alleging (1) retaliatory discharge, (2) violation of the Whistleblower Act, (3) intentional infliction of emotional distress, (4) negligent infliction of emotional distress, and (5) negligent supervision and training.

¶ 11   In November 2010, defendant filed its motion for summary judgment on all counts. In April 2011, the trial court heard oral argument in this case. In May 2011, the court entered summary judgment for defendant on all counts, finding defendant was, "for the reasons set forth in Defendant's Motion for Summary Judgment, entitled to judgment as a matter of law."

¶ 12    This appeal followed.

¶ 13                            II. ANALYSIS

¶ 14              A. Summary Judgment and the Standard of Review

¶ 15    Summary judgment is appropriate where the pleadings, depositions, admissions, and affidavits of record, when viewed in the light most favorable to the nonmoving party, establish (1) there is no genuine issue of material fact and (2) the moving party is entitled to a judgment as a matter of law. *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, 227 Ill. 2d 102, 106, 879 N.E.2d 305, 308 (2007); see 735 ILCS 5/2-1005(c) (West 2008).

¶ 16    "The burden of proof and the initial burden of production in a motion for summary judgment lie with the movant. [Citation.] Where the facts could lead a fair-minded person to draw more than one conclusion or inference, summary judgment must be denied." (Internal quotation marks omitted.) *Evans v. Brown*, 399 Ill. App. 3d 238, 243, 925 N.E.2d 1265, 1271 (2010). If the defendant raises an affirmative defense and establishes his factual position with supporting documents, the plaintiff must present a factual basis arguably entitling him to a judgment. *Id.* at 244, 925 N.E.2d at 1271. However, the plaintiff is not required to prove his case at the summary-judgment stage. *Id.*

¶ 17    We review a trial court's ruling on a motion for summary judgment *de novo*. *Id.*

¶ 18                            B. Retaliatory Discharge

¶ 19    Plaintiff first argues the trial court erred by granting defendant summary judgment on her claim of common-law retaliatory discharge. We disagree.

¶ 20    In general, "a noncontracted employee is one who serves at the employer's will, and the employer may discharge such an employee for any reason or no reason." (Internal quotation marks omitted.) *Turner v. Memorial Medical Center*, 233 Ill. 2d 494, 500, 911 N.E.2d 369, 374 (2009). A "limited and narrow" exception, the tort of retaliatory discharge, exists for retaliatory firings that violate the public interest. *Id.* The elements of retaliatory discharge are typically enumerated as follows: a plaintiff former employee must establish (1) that the former employer discharged the employee (2) in retaliation for the employee's activities and (3) in violation of a clear mandate of public policy. *Id.* Whether the plaintiff was discharged and whether the discharge was in retaliation for the employee's protected activities are questions of fact and, thus, are "generally more suitable for resolution by the trier of fact." *Id.* at 501 n.1, 911 N.E.2d at 375 n.1. In contrast, "[i]t is widely recognized that the existence of a public policy, as well as the issue whether that policy is undermined by the employee's discharge, presents questions of law for the court to resolve." *Id.* at 501, 911 N.E.2d at 374-75.

¶ 21    Here, the dispositive question is whether defendant violated clearly mandated public policy by firing plaintiff. The public-policy element of retaliatory discharge reflects the tort's role in striking "a proper balance *** among the employer's interest in operating a business

efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out." (Internal quotation marks omitted.) *Id.* at 502. Accordingly, although the term "clearly mandated public policy" eludes precise definition, "it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively." (Internal quotation marks omitted.) *Id.* at 500, 911 N.E.2d at 374. To qualify as a clear mandate of public policy, "a matter must strike at the heart of a citizen's social rights, duties, and responsibilities." (Internal quotation marks omitted.) *Id.* at 501, 911 N.E.2d at 374. Further, to be enforceable in a retaliatory-discharge action, a clearly mandated public policy must be sufficiently specific to put employers on notice that employment decisions relating to the policy may expose them to liability. *Id.* at 503, 911 N.E.2d at 375 ("An employer should not be exposed to liability where a public policy standard is too general to provide any specific guidance or is so vague that it is subject to different interpretations." (Internal quotation marks omitted.)); see also *id.* at 502-03, 911 N.E.2d at 375 ("Any effort to evaluate the public policy exception with generalized concepts of fairness and justice will result in an elimination of the at-will doctrine itself." (Internal quotation marks omitted.)). Examples of public policies too general or vague to be enforced in an action for retaliatory discharge include the " 'right to marry' a coworker [citation]; 'product safety' [citation]; 'promoting quality health care' [citation]; and 'the Hippocratic Oath' [citation]." *Id.* at 503, 911 N.E.2d at 376.

¶ 22    In the instant case, plaintiff claims she was discharged for (1) refusing to certify that medical records subject to court subpoena were complete, accurate, and prepared in the regular course of business since she believed defendant's record-keeping system failed to comply with legislative and accreditation standards; and (2) repeatedly complaining to coworkers, supervisors, and eventually, defendant's vice president of quality control about defendant's perceived noncompliance with such legislative and accreditation standards.

¶ 23    According to our weighing of the interests of the parties and the citizens of this State, plaintiff's discharge, even if motivated by these actions plaintiff took, could not have violated a clearly mandated public policy. This is because plaintiff, as operations manager of the health information department and its representative with respect to the hospital's accreditation, was herself responsible for bringing defendant into compliance with the regulations she complained defendant violated. Whether plaintiff was adequately performing her job with respect to defendant's compliance with laws governing the maintenance of its patients' medical records is more a dispute for the parties to resolve privately than a public matter justifying the courts' involvement on behalf of the citizenry as well as the individual employee, even though the integrity of essential health information may have been at stake. Even if, as she alleges, plaintiff was fired for speaking out against defendant's failure to protect the confidentiality and ensure the accuracy of patients' medical records as required by law and the industry's best practices, it would be unfair to punish defendant for releasing plaintiff under these circumstances. This conclusion holds whether plaintiff's claim is framed as a generic retaliatory-discharge claim or under the so-called "citizen crime-fighter" line of cases (see, *e.g.*, *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 132-33, 421 N.E.2d 876, 880 (1981)).

¶ 24    Our analysis purposely leaves inessential questions unresolved: particularly, whether (1)

at this stage in the proceedings, it may be said that plaintiff's discharge was retaliatory as a matter of fact; and (2) plaintiff's asserted public policy of "protecting the privacy rights of individuals with respect to their medical information" may, in general, substantiate a retaliatory-discharge claim. These questions need not be determined to establish that defendant was entitled to summary judgment on this count of plaintiff's complaint. Rather, the question at the heart of our decision is whether plaintiff's discharge could have violated any clearly mandated public policy. It could not have.

¶ 25    For these reasons, we conclude the trial court did not err in granting summary judgment for defendant on plaintiff's retaliatory-discharge claim.

## C. Whistleblower Act

¶ 27    Next, plaintiff argues the trial court erred by granting defendant summary judgment on plaintiff's claim alleging her firing violated the Whistleblower Act (740 ILCS 174/1 through 35 (West 2006)). We disagree.

¶ 28    In relevant part, section 20 of the Whistleblower Act states: "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/20 (West 2006). Plaintiff claims that she was retaliated against for refusing to sign certifications accompanying subpoenaed medical records stating that the record was complete and accurate and had been prepared in the course of defendant's business. In light of her suspicion that defendant's noncompliance with legislative and accreditation standards with respect to its record-keeping system led to possible inaccuracies in patients' medical records, plaintiff claims she would have violated state or federal law if she had signed the certificates.

¶ 29    Assuming *arguendo* that defendant fired plaintiff in retaliation for her refusal to sign these certifications, plaintiff fails to persuade us defendant breached the Whistleblower Act because she cites no law, rule, or regulation which she would have violated by participating in the refused activity. In her initial brief, plaintiff contends signing such certifications would have violated the Federal Rules of Evidence related to self-authenticating documents. Specifically, plaintiff claims that her certification of medical records she suspected were tainted by defendant's inadequate record-keeping system would have run afoul of Rule 902(11), which provides for self-authentication of domestic records of regularly conducted business activity (authentication being a prerequisite to admissibility). Fed. R. Evid. 902(11). That rule provides, in pertinent part, that an otherwise admissible business record is self-authenticating if accompanied by a certification by the record's custodian that it (1) "was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters"; (2) "was kept in the course of the regularly conducted activity"; and (3) "was made by the regularly conducted activity as a regular practice." Fed. R. Evid. 902(11). The rule further provides that "[a] party intending to offer a record into evidence under this paragraph *** must make the record and declaration [(certification)] available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them." Fed. R. Evid. 902(11).

¶ 30 Rule 902(11) provides no support for plaintiff's claim that certifying a business record for self-authentication under the Federal Rules of Evidence may violate a law, rule, or regulation if the certification's maker knows or suspects that the business record may be inaccurate due to the business's noncompliance with record-maintenance principles. Nevertheless, plaintiff purports to quote from the same rule as follows: " 'The word "certification" as used in this subsection means with respect to a domestic record . . . if falsely made, would subject the maker to criminal penalty under the laws of the country.' " This erroneous quotation apparently was derived from Rule 902(12), regarding self-authentication of foreign business records, which provides, in relevant part: "The declaration must be signed in a manner that, if falsely made, would subject the maker to criminal penalty under the laws of the country where the declaration is signed." Fed. R. Evid. 902(12). This provision is irrelevant to the self-authentication of the regularly kept records of an American business and does not itself establish penalties for untruthful certifications accompanying self-authenticating business records.

¶ 31 Rule 902(11) says nothing about the accuracy or genuineness of a certification. In fact, Rule 902(11) provides a means for an adverse party to oppose self-authentication where the certification accompanying the record may be spurious. False certifications were, thus, apparently contemplated by the drafters of the rule. Further, it is unclear defendant's medical records would be self-authenticating under Rule 902(11) as the form of defendant's certifications does not track the essential language of that rule.

¶ 32 This conclusion finds additional support in Illinois Rule of Evidence 902(11), which our supreme court adapted from Federal Rule 902(11). Illinois Rule of Evidence 902(11) defines a qualifying certification with respect to a domestic record, in part, as "a written declaration under oath subject to the penalty of perjury." Plaintiff has not claimed the certifications defendant issued with subpoenaed medical records were made under oath subject to the penalty of perjury. Accordingly, the relevance of these rules on self-authenticating documents to plaintiff's Whistleblower Act claim is dubious.

¶ 33 Plaintiff points out that Illinois Supreme Court Rule 236(a) (eff. Aug. 1, 1992) similarly allows for the admission of certain business records in state cases. However, aside from specific identified exceptions, "[a]ll other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but not its admissibility." Ill. S. Ct. R. 236(a). Under Rule 236(a), defendant's medical records made in the regular course of business, such as the medical records plaintiff was asked to certify, would be admissible in a civil proceeding in Illinois regardless of plaintiff's suspicion of defendant's illegality in the maintenance of medical records.

¶ 34 No provision in the evidentiary rules cited by plaintiff in her opening brief would render illegal her certification of an improperly stored medical record as complete, accurate, and produced in defendant's regular course of business. Plaintiff's reliance on these rules to establish defendant's violation of the Whistleblower Act is unpersuasive.

¶ 35 In her reply brief, plaintiff baldly asserts that "falsely certifying public documents is subject to criminal penalty." Even setting aside the fact that the medical records plaintiff was asked to certify are clearly private–not public–documents, plaintiff's failure to cite relevant

authority for this proposition violates Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008) (requiring argument to "contain the contentions of the appellant and the reasons therefor, with citation of the authorities"). Plaintiff's assertions of law unaccompanied by citation to pertinent authority are unpersuasive.

¶ 36     Plaintiff fails to cite a law she would have violated by making a certification to accompany a subpoenaed medical record stating the record was complete, accurate, and made in the regular course of defendant's business. Accordingly, her refusal to sign such certifications was not protected by the Whistleblower Act, and even assuming defendant fired her in retaliation for so refusing, the trial court did not err by granting defendant summary judgment on plaintiff's claim that her discharge violated the Whistleblower Act.

¶ 37                    D. Intentional Infliction of Emotional Distress

¶ 38     Next, plaintiff argues the trial court erred by granting defendant summary judgment on plaintiff's claim of intentional infliction of emotional distress. We disagree.

¶ 39     The elements of intentional infliction of emotional distress are that (1) the defendant engaged in "extreme and outrageous" conduct toward the plaintiff, (2) the defendant intended or recklessly disregarded the probability that the conduct would cause the plaintiff to suffer emotional distress, (3) the plaintiff endured "severe or extreme" emotional distress, and (4) the defendant's conduct actually and proximately caused the plaintiff's distress. *Hayes v. Illinois Power Co.*, 225 Ill. App. 3d 819, 826, 587 N.E.2d 559, 563 (1992). "Whether certain conduct can be characterized as extreme and outrageous so as to support a cause of action for the tort of intentional infliction of emotional distress necessarily depends on the facts of each case." *Id.* at 827, 587 N.E.2d at 564. Whether particular conduct is extreme and outrageous is treated as a question of law as "extreme and outrageous" is a legal, not a factual, standard. See *id.* (holding the trial court's dismissal of the plaintiff's complaint was proper where the conduct alleged could not be characterized as "extreme and outrageous"); see also *Thomas v. Fuerst*, 345 Ill. App. 3d 929, 936, 803 N.E.2d 619, 625 (2004) ("Whether conduct is extreme and outrageous is evaluated on an objective standard based on all of the facts and circumstances.").

¶ 40     Extreme and outrageous behavior does not include "mere insults, indignities, threats, annoyances, petty oppressions or trivialities." (Internal quotation marks omitted.) *Hayes*, 225 Ill. App. 3d at 826, 587 N.E.2d at 563. To give rise to liability, it is insufficient that the conduct complained of "has been characterized by 'malice.' " (Internal quotation marks omitted.) *Id.* The defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." (Internal quotation marks omitted.) *Id.* at 826-27, 587 N.E.2d at 563. That is, the case must be such that the "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous[!]' " (Internal quotation marks omitted.) *Reilly v. Wyeth*, 377 Ill. App. 3d 20, 37, 876 N.E.2d 740, 755 (2007).

¶ 41     Whether the defendant enjoys a position of authority over the plaintiff may affect the determination of whether the defendant's conduct toward the plaintiff is extreme and outrageous. *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767 (1976).

However, due to the sensitivities of the employment relationship, courts have required an employer's conduct to be "truly *** egregious" before it may give rise to liability. *Lewis v. School District #70*, 523 F.3d 730, 747 (7th Cir. 2008). This is because "[e]mployers often and necessarily take actions during the course of business that result in emotional distress." *Id.*; see also *Wal-Mart Stores, Inc. v. Bertrand*, 37 S.W.3d 1, 13 (Tex. Ct. App. 2000) ("[E]mployers need to be able to supervise, review, criticize, demote, transfer, discipline and terminate employees. [Citation.] These circumstances are often stressful and unpleasant for an employee and at times may even be unwarranted. [Citation.] Nevertheless, an employer must have latitude to exercise these rights in a permissible way even though emotional distress results." (Internal quotation marks omitted.)).

¶ 42    In this case, defendant's conduct toward plaintiff was not extreme and outrageous. In her complaint, plaintiff alleges defendant "repeatedly made demands upon Plaintiff for her to engage in illegal activity by processing medical records in a manner that violated public policy" and state and federal law. She claims these demands and defendant's retaliatory behavior toward her following her refusal to engage in illegal activities constituted extreme and outrageous conduct.

¶ 43    An employer may engage in extreme and outrageous conduct toward its employees if it coerces them to commit a crime. For example, in *Milton v. Illinois Bell Telephone Co.*, 101 Ill. App. 3d 75, 79-80, 427 N.E.2d 829, 832-33 (1981), the appellate court held the defendant employer's insistence that the plaintiff, its employee, falsify public utility filings, a Class A misdemeanor, substantiated the plaintiff's claim of intentional infliction of emotional distress.

¶ 44    Here, plaintiff's position as operations manager of defendant's health information department traditionally required her to certify that medical records released under subpoena were complete, accurate, and made in the course of defendant's business. When defendant implemented its electronic record-keeping system, plaintiff refused to continue certifying the accuracy of these records due to her concern that defendant's system did not comply with legal and accreditation standards. Contrary to plaintiff's complaint, however, the evidentiary exhibits accompanying defendant's motion for summary judgment show that plaintiff was immediately relieved of her responsibility to certify records when she refused to continue the practice as her supervisor, Guffey, undertook their certification. This undermines plaintiff's assertion that she was repeatedly asked to engage in illegal activity. Further, as discussed above, and in contrast with *Milton*, plaintiff has not established that the behavior defendant requested of her would have subjected her to civil or criminal penalties. Accordingly, plaintiff's claim finds no support in the rule she cites.

¶ 45    Following plaintiff's refusal to continue certifying subpoenaed medical records, according to plaintiff, defendant retaliated against plaintiff in the following ways: Guffey acted angry and addressed her sarcastically and in an "openly hostile" manner; Guffey discussed her performance with other employees; Guffey informed other employees that plaintiff would likely be discharged; plaintiff was given "negative feedback," such as indications that her attitude was poor, she lacked leadership talent, and her accomplishments were unsatisfactory; she was not offered "support"; her office was relocated twice; her secretary was reassigned; she was told her "education was useless"; she was asked to do

work that had been previously assigned to lower-level employees; and she was ultimately discharged.

¶ 46    The prolonged and unexpected deterioration of an employment relationship is understandably stressful for an employee. Nevertheless, considering defendant's role as plaintiff's employer, in which defendant was called upon continuously to evaluate plaintiff's performance and occasionally to make necessarily distressing employment decisions, we conclude defendant's alleged conduct in this case–however unpleasant–did not meet the standard of "extreme and outrageous" conduct. Whether one could describe defendant's handling of the last several months of plaintiff's employment as displeasing, no conduct alleged of defendant would provoke in an ordinary person the kind of disdainful response that defines extreme and outrageous conduct within the employment relationship. Accordingly, the trial court did not err in granting defendant summary judgment on plaintiff's claim of intentional infliction of emotional distress.

¶ 47              E. Negligent Infliction of Emotional Distress, Negligent
                            Supervision and Training

¶ 48    Finally, plaintiff argues the trial court erred by granting defendant summary judgment on the counts of her complaint alleging negligent infliction of emotional distress and negligent supervision and training. We disagree.

¶ 49                    1. *Forfeiture of Affirmative Defense and Laches*

¶ 50    In its order granting defendant's motion for summary judgment, the trial court implicitly adopted defendant's argument that plaintiff's claims of negligent infliction of emotional distress and negligent supervision and training were preempted by the Workers' Compensation Act (820 ILCS 305/1 through 30 (West 2006)). In ruling for defendant, the court implicitly rejected plaintiff's argument that defendant forfeited the defense of preemption by failing to raise it in its answer or, alternatively, that the defense was barred by *laches*.

¶ 51    Here, plaintiff again argues the preemption defense is barred by forfeiture or *laches*. Ordinarily, an affirmative defense that is not pled is forfeited. See *In re Guardianship of Jordan M. C.-M.*, 351 Ill. App. 3d 700, 705, 814 N.E.2d 232, 236 (2004). However, a trial court may within its discretion allow a party to amend its pleadings at any time before final judgment is entered. *DiBenedetto v. County of Du Page*, 141 Ill. App. 3d 675, 681, 491 N.E.2d 13, 18 (1986). We will not reverse a court's allowance of such an amendment absent an abuse of discretion. *Id.* "The test as to whether that discretion has been properly exercised is whether the amendment furthers the ends of justice." *Id.* Relevant considerations include whether the amendment surprises or prejudices an adverse party. *Id.* We treat the trial court's allowing defendant to raise the preemption defense in its motion for summary judgment as an implied grant of leave to amend defendant's earlier pleadings.

¶ 52    *Laches*, in contrast to forfeiture, "is an equitable doctrine which precludes the assertion of a claim by a litigant whose unreasonable delay in raising that claim has prejudiced the

opposing party." *Tully v. State*, 143 Ill. 2d 425, 432, 574 N.E.2d 659, 662 (1991). "Two elements are necessary to a finding of *laches*: (1) lack of diligence by the party asserting the claim and (2) prejudice to the opposing party resulting from the delay." *Id.* "The determination of whether *laches* applies depends on the facts and circumstances of each case and lies within the sound discretion of the trial judge. [Citation.] A trial judge's ruling with respect to *laches* is reviewed under the 'abuse of discretion' standard of review." *Marshall v. Metropolitan Water Reclamation District Retirement Fund*, 298 Ill. App. 3d 66, 74, 697 N.E.2d 1222, 1228 (1998).

¶ 53    In this case, the trial court did not err in allowing defendant, in effect, to amend its answer to incorporate the preemption defense or in finding the defense was not barred by *laches*. Plaintiff claims she was prejudiced because the defense was raised for the first time after the parties had engaged in two years of discovery, causing plaintiff to incur "large" litigation costs and thwarting her intended litigation strategy. Plaintiff neglects the possibility that some amount of discovery–including defendant's requesting, awaiting, and later evaluating plaintiff's bill of particulars fleshing out the allegations of her complaint–may have been necessary for defendant to determine whether the evidence would show her claims were preempted by the Workers' Compensation Act. Moreover, without a more specific allegation of prejudice, the court would not have erred by finding that the effective amendment of the answer to allow the parties to address this defense furthered the ends of justice insofar as the legislature, according to defendant's argument, intended these claims to be pursued exclusively under a different legal apparatus.

¶ 54                  2. *Preemption by Workers' Compensation Act*

¶ 55    Plaintiff further argues her claims for negligent infliction of emotional distress and negligent supervision and training are not preempted by the Workers' Compensation Act. Section 5(a) of that Act states, in pertinent part: "No common law *** right to recover damages from the employer *** for injury *** sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act ***." 820 ILCS 305/5(a) (West 2006). Section 11 provides, in part, "The compensation herein provided, together with the provisions of this Act, shall be the measure of the responsibility of any employer" covered by the Act. 820 ILCS 305/11 (West 2006). Accordingly, in general, the Workers' Compensation Act preempts employees' claims of negligent infliction of emotional distress and negligent supervision arising out of their employment. *Doe v. La Magdalena II, Inc.*, 585 F. Supp. 2d 984, 986 (N.D. Ill. 2008) ("The [Workers' Compensation Act] abrogates employer liability for all common law negligence claims." (Internal quotation marks omitted.)); see also, *e.g.*, *id.* at 986-87 (dismissing the plaintiff's claims as barred by the Workers' Compensation Act). A negligence claim avoids preemption only if the plaintiff can establish the injury "(1) was not accidental[,] (2) did not arise from his or her employment, (3) was not received during the course of employment or (4) was noncompensable under the [Workers' Compensation] Act." *Collier v. Wagner Castings Co.*, 81 Ill. 2d 229, 237, 408 N.E.2d 198, 202 (1980).

¶ 56    Plaintiff first claims the injury resulting from defendant's alleged negligent infliction of emotional distress avoids preemption because it occurred in part after plaintiff's discharge. Plaintiff bases this argument on an assertion in an affidavit accompanying her response to defendant's motion for summary judgment, where plaintiff's colleague attested she was asked after plaintiff's firing "where [her (the colleague's)] loyalties" were. However, this incident was not alleged in plaintiff's complaint. Further, the coworker did not attest that she reported the incident to plaintiff. If the exchange never got back to plaintiff, the exchange could not substantiate plaintiff's claim of negligent infliction of emotional distress as the element of causation would be negated. Plaintiff's argument against preemption of this claim is thus unconvincing.

¶ 57    Next, plaintiff argues her claim of negligent supervision and training is not preempted because the resulting injury was intended, not accidental. Plaintiff assigns intent to Guffey in her discussion of plaintiff's performance with other employees and ridicule of plaintiff behind her back. However, plaintiff's claim that Guffey intended to harm plaintiff is insufficient to defeat preemption. Rather, plaintiff must show defendant acted intentionally, not merely negligently. Yet plaintiff's allegations of intent do not extend to defendant itself. Exhibits show that plaintiff never reported Guffey's alleged misbehavior to Guffey's superiors. As plaintiff has not established defendant's knowledge of plaintiff's complaints with respect to the harm she perceived Guffey was causing, it cannot be said that defendant intended to cause plaintiff harm by inadequately supervising or training Guffey. Any injury plaintiff suffered in this regard was at most accidental and, accordingly, is preempted by the Workers' Compensation Act.

¶ 58    The trial court did not err in granting defendant summary judgment on plaintiff's claims of negligent infliction of emotional distress and negligent supervision and training as they are preempted by the Workers' Compensation Act.

¶ 59                                    III. CONCLUSION

¶ 60    For the foregoing reasons, we affirm the trial court's judgment.

¶ 61    Affirmed.