# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Mo v. Hergan*, 2012 IL App (1st ) 113179

| | |
|---|---|
| Appellate Court Caption | GLENNA K. MO, individually and on behalf of RHOMBUS ASSET MANAGEMENT, INC. and CENTRAL AND EASTERN EUROPEAN INVESTMENT FUND, Plaintiff-Appellant, v. ALEXANDER HERGAN, an individual, MARK PROSKINE, an individual, EDWIN WARMERDAM, an individual, PRICEWATERHOUSECOOPERS, a Romanian accounting and financial services firm, PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED, a global network company, RHOMBUS ASSET MANAGEMENT, INC., an Illinois corporation, and CENTRAL AND EASTERN EUROPEAN INVESTMENT FUND, a Cypriot corporation, Defendants-Appellees. |
| District & No. | First District, First Division<br>Docket Nos. 1-11-3179, 1-11-3731 cons. |
| Filed | December 17, 2012 |
| Rehearing denied | January 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from plaintiff's investment in real estate ventures with defendants, the trial court properly dismissed or entered judgments for defendants on plaintiff's numerous claims, including breach of fiduciary duty, fraud, conversion and conspiracy, since *laches* barred her claims based on the allocation of her ownership interest in the ventures to the extent that she delayed asserting her claims while awaiting the outcome of the investments, she violated discovery orders with respect to other claims, and the named defendant was entitled to summary judgment as to the remaining claims. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-5888; the Hon. Sanjay T. Tailor, Judge, presiding. |

| | |
|---|---|
| Judgment | No. 1-11-3179, Affirmed. |
| | No. 1-11-3731, Dismissed. |
| | |
| Counsel on Appeal | John Leja, Jeremy Unruh, Rodney Lewis, and G. Gabriel Zorogastua, all of Polsinelli Shughart, PC, of Chicago, for appellant. |
| | |
| | Bellows & Bellows, PC (Joel Bellows and Schuyler Geller, of counsel), and Law Offices of Gary N. Goldberg (Gary N. Goldberg, of counsel), both of Chicago, for appellees. |
| | |
| Panel | PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion. |
| | Justices Cunningham and Delort concurred in the judgment and opinion. |

## OPINION

¶ 1    In appeal number 1-11-3179, the plaintiff, Glenna Mo (on behalf of Rhombus Asset Management, Inc. (Rhombus), and Central and Eastern European Investment Fund (Central)) appeals the circuit court judgments dismissing six counts of her complaint against defendants Alexander Hergan and Mark Proskine, granting summary judgment in favor of Hergan on three counts of her complaint, and dismissing Proskine from the case as a discovery sanction. In appeal number 1-11-3731, the plaintiff appeals a circuit court ruling denying her postjudgment request for further proceedings, namely, a ruling on an issue the court had deemed moot.[1] For the reasons that follow, we affirm the judgment of the circuit court in appeal number 1-11-3179, and we dismiss appeal number 1-11-3731.

¶ 2    In November 2008, the plaintiff filed her corrected amended complaint seeking over $150 million in damages from the defendants. According to the complaint, Hergan, Wasendorf, Proskine, and the plaintiff formed Rhombus in 1998 for the purpose of acquiring real estate that they referred to as the Avrig 35 project. The plaintiff contributed $500,000 to the venture and loaned Hergan $185,000 of his contribution. At the time, the plaintiff was given a 15.43% ownership interest in the Avrig 35 project; she alleged that she accepted this minimal share after Hergan promised that the ownership interests would be recalculated later to reflect the owners' actual contributions. The venture subsequently acquired a second property–the Barthelot property–and the plaintiff alleged that she loaned Hergan $119,000

---

[1]The plaintiff's causes of action against additional defendants Pricewaterhousecoopers (PWC) and Pricewaterhousecoopers International (PWCI) have been resolved and are not at issue in this appeal.

of his $127,000 contribution to that acquisition. According to the complaint, for the next four years, Hergan found additional real estate opportunities and solicited funds from the Rhombus owners, but the plaintiff was the only shareholder to contribute money to "many" of these investments.

¶3    For one such investment, the Canadian Embassy project, she contributed $500,000, with $250,000 in the form of a loan to Hergan; an outside investor contributed $500,000; and the remaining Rhombus shareholders contributed nothing. She alleged that she made her contribution with the understanding that she and Hergan alone would share a one-half interest in the property. She later learned, however, that the ownership interest had been allocated to all four Rhombus shareholders in the same proportions as their Rhombus ownership, so that she received only 15.43% of the one-half interest. The plaintiff alleged that she confronted Hergan regarding this discrepancy and was assured that the ownership interests would be corrected.

¶4    In a second project, the Charles de Gaulle project, the plaintiff again was the only shareholder to contribute (both with her own money and with loans she obtained), and again she contributed with the understanding that only she and Hergan would hold ownership in the project. A bank later purchased half of this project for $5.5 million, and, over the plaintiff's objection, Hergan used some of these funds to pay liabilities on the Avrig 35 project and to pay dividends to Rhombus shareholders. Hergan also allowed additional Rhombus shareholders to invest in the project, whose value had increased to $11 million, by contributing $250,000. The ownership interests in the project were then allocated in the same proportions as the Avrig 35 project.

¶5    According to the complaint, Hergan eventually approached PWC and worked with Edwin Warmerdam to obtain financial and accounting advice. Warmerdam and PWC recommended that new entities be formed for each investment the parties undertook, and that all these entities be owned by a Netherlands corporation, F&C International BV (F&C), which in turn would be owned by Central. When Central was formed, its ownership was allocated in the same percentages as the Avril 35 project, despite the plaintiff's understanding that her contributions would be reflected in new ownership allocations.

¶6    The complaint alleged that, in January 2004, Proskine, Hergan, and the plaintiff agreed to a reallocation of the ownership interests of each of the properties in which they had invested. However, following a 2004 meeting of Central's shareholders, the ownership of the Charles de Gaulle project was modified to indicate an even larger allocation to Hergan and Proskine. At a 2005 Central shareholders meeting, the plaintiff again raised her concerns about the ownership allocations, but Hergan and Proskine responded that they were not interested in decreasing their ownership stakes.

¶7    Around June 2006, Central's shareholders held another meeting, where the plaintiff agreed, "[i]n an effort to finally put an end to the dispute," to accept a 25% interest in the Avrig 35, Charles de Gualle, and Canadian Embassy projects; a 25% interest in one additional project; and a 20% interest in all remaining projects. However, Wamerdam–at that time a new Central shareholder–refused to sign that agreement. Proceeds of the Charles de Gaulle project were later distributed without giving the plaintiff the increased stake she

had requested.

¶ 8    The complaint further alleged that Proskine allowed the plaintiff to make interest payments on Rhombus's behalf, and later to personally repay loans she had obtained for Rhombus, while he caused Rhombus to reimburse him for similar expenses. In addition, the complaint asserted that Proskine and Hergan caused Rhombus to issue very favorable loans to their friends, without the plaintiff's knowledge. Further, the complaint stated that Proskine had "routinely" written checks from Rhombus to himself (in one case to purchase a personal automobile) or to friends, and had in fact forged the plaintiff's signature on company checks and cashed checks without the account's required second signature.

¶ 9    The plaintiff alleged that, in October 2000, as these investment activities were ongoing, she and Hergan reached a separate agreement under which he agreed to transfer to her 5% of his interest in Avrig 35 in exchange for forgiveness of $250,000 in loans she had given him. According to the complaint, that 5% interest was never conveyed to the plaintiff.

¶ 10   Based on these allegations, the complaint raised claims against Hergan, Proskine, and Warmerdam for breach of fiduciary duty (count I); common law fraud (count III); a scheme to defraud (count IV); conversion (count VI); and civil conspiracy (count VII). The complaint added claims against PWC and PWCI for aiding and abetting a breach of fiduciary duty (count II); and aiding and abetting a scheme to defraud (count V). It also raised derivative claims (on behalf of Rhombus and Central) against Hergan, Proskine, and Warmerdam for breach of fiduciary duty (count VIII) and waste of corporate assets (count IX).

¶ 11   Hergan and Proskine filed motions to dismiss the complaint, and, on November 24, 2009, the circuit court granted those motions with respect to counts II through VII; counts I, VIII, and IX were advanced for further proceedings.

¶ 12   In February 2010, after Hergan and Proskine had filed their answers to the complaint, the circuit court entered a case management order directing the parties to complete discovery by August 9, 2010. In July, Hergan filed a motion to compel the plaintiff's compliance with discovery; that document asserted that the plaintiff had failed to respond to interrogatories or requests for production of documents despite entreaties from opposing counsel. The circuit court granted Hergan's motion to compel and ordered the plaintiff to comply with discovery requests before August 5, 2010. On August 20, the date of the next hearing in the case, the circuit court entered an order noting that counsel for Hergan and Proskine had moved for sanctions and setting the matter for hearing "for [the plaintiff's counsel] to offer proof of deposition noticed" in the case and "continuances asked resetting of the same." On August 27, the circuit court entered an order stating that the matter had been heard and that "[p]laintiff's representations to the Court on August 20, 2010 were false and no discovery has been issued by Plaintiff." The order sanctioned the plaintiff's counsel and ordered the plaintiff to comply with discovery requests by September 6, 2010. On September 8, the court entered an order noting that the matter had been heard and ordering that Proskine be dismissed from the case with prejudice. No transcripts of any hearings relating to this discovery dispute appear in the record on appeal.

¶ 13   In July 2011, Hergan filed a motion for summary judgment on counts I, VIII, and IX of the complaint. With respect to the latter two counts, which were brought as derivative actions

on behalf of Rhombus and Central, Hergan asserted that the plaintiff's suit should be dismissed because she had failed to serve those corporations; that he was protected by the business judgment rule; that there was no showing that he breached a duty to the plaintiff or the corporations; that there was no showing that he wasted corporate assets; and that the plaintiff's claims should be barred by *laches*.

¶ 14    In an excerpt of the transcript of Proskine's deposition attached to Hergan's motion, Proskine testified that the Rhombus ownership allocation was determined by agreement of the owners and was intended to reflect the amount of work each owner put into the venture. He testified that all of the owners made equal initial investments of $500,000. Proskine further testified that the plaintiff began arguing that her loans to the company should be converted to equity only after she saw that the venture was thriving.

¶ 15    In excerpts of Hergan's deposition, Hergan testified that all of the Rhombus owners agreed to the equity distribution and that the owners all contributed equal equity to the venture. He said that any funds that came into the company after that initial investment, including capital calls, came in the form of loans from the owners.

¶ 16    Among the documentary evidence attached to Hergan's motion for summary judgment was a 1998 organizational agreement signed by the plaintiff setting her Rhombus ownership at 17% and an October 2002 agreement signed by the plaintiff indicating that the plaintiff held a 15% share in Central.

¶ 17    Hergan attached to his motion for summary judgment a copy of a June 9, 2006, agreement among several of the Central owners (and signed by the plaintiff). The agreement stated that the plaintiff would have a 15% ownership interest in Central and in the Charles de Gaulle, Canadian Embassy, and Avrig 35 projects. The agreement further stated that Central would repay loans and expenses to several parties before distributing equity. The plaintiff is listed among the parties whose debt and expenses were to be reimbursed, but her name is accompanied by a note stating "expense reimbursement only, including but not limited to legal fees she incurred in an amount not to exceed $70,000."

¶ 18    Hergan testified that, at some point, the plaintiff sought to convert her loans to equity instead of having the loans paid off with cash from the company. According to Hergan, Rhombus determined in 2006 that it could make a distribution to its shareholders, but it decided to first pay off its outstanding loans. Hergan said that loans sourced by the plaintiff were not paid off at that time, because the plaintiff "chose to get her money as a conversion of her loans and to equity, and, as such, she was paid exactly what the [distribution] formula called for which was 25 percent of the distribution." Otherwise, he testified, the corporation paid all of its debts.

¶ 19    A June 21, 2006, email sent to the owners by a financial advisor indicated that the remaining debts paid at the time of the distribution included one loan with a 15% interest rate and $72,500 due at repayment ($50,000 principal, $22,500 interest), one loan with a 100% balloon payment of $200,000 (equal parts principal and interest), and one loan with a 100% balloon payment of $30,000 (equal parts principal and interest). (In his deposition testimony, Hergan discussed two loans the company paid off with approximately $1.5 million, which was approximately twice the initial loan amounts.) The email also detailed additional

expenses and cash movements for the company. A schedule attached to that email indicated that the plaintiff would receive an approximately $4.1 million cash dividend distribution, out of a $16.6 million pool.

¶ 20      Near this time, the plaintiff apparently contacted an attorney to help her negotiate with her co-owners. In that attorney's telephone notes, which were attached to Hergan's motion for summary judgment, the attorney indicates that the plaintiff had objections to the company's not paying off loans she sourced, but elected to accept the cash distribution because she "want[ed] to receive money first" and then raise her objections.

¶ 21      In his deposition, Hergan also described Proskine's decision to purchase a Hummer automobile with Rhombus funds. He explained that they needed an all-terrain vehicle in order to be able to access mountainous parts of one of their projects in Romania and bought the Hummer based on assurances that the car could be serviced at a Hummer dealership in Romania. They later learned that there was no Hummer dealership in Romania, so they declined to ship the car overseas. Hergan testified that Proskine assumed the payments for the automobile personally when Rhombus "didn't have any more money in the account."

¶ 22      Also attached to Hergan's motion for summary judgment was a copy of the plaintiff's responses to requests to admit. In those responses, the plaintiff admitted that she had made no demand on Rhombus or Central to bring a derivative suit and that she had full access to Rhombus's bank statements during her time as an officer for the company.

¶ 23      In response to Hergan's motion for summary judgment, the plaintiff argued that Hergen was not protected by the business judgment rule because he did not exercise due care or acted in bad faith and that evidence showed that Hergan did waste corporate assets. The plaintiff's response relied in several parts on the allegations she raised in her complaint. However, she also attached excerpts of Proskine's deposition, in which he stated that Hergan was the "sole administrator" of the company. In those same excerpts, Proskine explained why the June 9, 2006, agreement never took effect. He said that Warmerdam never signed the agreement and that the plaintiff "reneged" on it. He described her reneging as follows:

> "The common thread is always loaner equity. She waited until the company was thriving, demanded to convert her equity, her loans and equity, which was the reason she got that percentage. When we *** sent her the check, she cashed it.

> Then she had her lawyer call us and [say] where is the money for my debtors ***. [W]e said well, you converted it."

¶ 24      In excerpts of the deposition of Russell Wasendorf, another Rhombus shareholder, Wasendorf testified that Hergan made most decisions for Rhombus and Central but was removed by the board in 2009 because it "no longer trusted" him. Wasendorf explained that Hergan was "not providing information regarding the *** business that was being conducted *** in Romania," and that the board was "not getting good financial information" or "getting good communication in general." Wasendorf also expressed his general displeasure with the allocation of Rhombus and Central ownership shares and with his lack of knowledge about company issues.

¶ 25      In attached excerpts of her own deposition, the plaintiff explained that she loaned money to Hergan on several occasions, often without full consideration due to the urgency of

Hergan's requests. She described one meeting in which Hergan offered to "give [her] five percent of whatever the project that we were involved in at that time to pay back *** the money that he owed [her]." She testified that she did not have that document at the deposition, and the deposition excerpt ends as follows:

"Q. *** Exhibit 9 was supposed to replace that document, wasn't it?

A. Replace? Well, I don't know if this was."

¶ 26    The next exhibit to the plaintiff's response is a copy of a handwritten note, signed by Hergan, stating that he would give the plaintiff 5% of his interest in Avrig 35 in exchange for forgiveness of a $250,000 loan; the exhibit after that is a typed document to the same effect signed by both Hergan and the plaintiff.

¶ 27    On September 2, 2011, the circuit court granted Hergan's motion for summary judgment on counts I, VIII, and IX, the remaining counts of the complaint, as too vague to create genuine issues of material facts. In so ruling, the judge explained in open court that he would not rule on the question of whether the corporate defendants were properly served, because he believed the issue to be moot in light of the fact that he had entered orders disposing of all of the plaintiff's claims.

¶ 28    On September 30, the plaintiff filed a motion for extension of time to file a motion challenging the circuit court's ruling. On October 20, the court set the matter for a hearing on November 8. Meanwhile, on November 1, the plaintiff filed in this court a motion for leave to file a late notice of appeal, and the appeal was docketed as number 1-11-3179. The plaintiff's motion was granted on November 9, then vacated on December 9. On February 23, 2012, however, we granted the plaintiff's motion to reinstate her appeal and allow her late notice of appeal.

¶ 29    On November 8, the circuit court denied the plaintiff's motion for extension, and denied the plaintiff's request for further proceedings on the jurisdiction issue. The plaintiff filed a notice of appeal from that decision on December 5, and the appeal was docketed as number 1-11-3731. On January 20, 2012, Hergan filed a motion arguing that we lacked jurisdiction over this second appeal, because it was taken from a circuit court order entered more than 30 days after the final order in the case. In April 2012, a panel of this court denied Hergan's motion.

¶ 30    We begin our discussion with the plaintiff's second appeal, in case number 1-11-3731. Although a motion panel of this court denied Hergan's motion to dismiss this appeal, we have an independent duty to determine if we have jurisdiction and to dismiss the appeal if jurisdiction is lacking. *In re Marriage of Waddick*, 373 Ill. App. 3d 703, 705, 869 N.E.2d 1089, 1090 (2007). After an independent review, we conclude that Hergan's motion to dismiss was meritorious.

¶ 31    "In the absence of a timely filed postjudgment motion, a trial court loses jurisdiction over a case pending before it 30 days after the entry of a final judgment terminating the litigation." *Holwell v. Zenith Electronics Corp.*, 334 Ill. App. 3d 917, 922, 779 N.E.2d 435, 440 (2002). The plaintiff argues that the circuit court's September 2, 2011, order granting summary judgment to the defendants on the remainder of the plaintiff's complaint was not a final order, because it left open the question of whether the plaintiff had properly served two of

the defendants. However, as the circuit court explained, that jurisdictional issue became moot when the court rejected all of the plaintiff's claims on other grounds. The September 2 order disposed of the entire case, and it constituted a final order. The question becomes, then, whether the plaintiff filed a postjudgment motion within 30 days of the September 2 order.

¶ 32    To qualify as a postjudgment motion, a motion must be directed against the judgment and request one or more of the types of relief specified in section 2-1203 of the Code of Civil Procedure (735 ILCS 5/2-1203 (West 2010)). *Marsh v. Evangelical Covenant Church of Hinsdale*, 138 Ill. 2d 458, 461-62, 563 N.E.2d 459, 461 (1990). The only motion filed by the parties within 30 days of the September 2 order disposing of the case was the plaintiff's motion for an extension of time to file a motion challenging the ruling. This motion, by its very terms, was not directed against the judgment and thus did not qualify as a postjudgment motion. See 735 ILCS 5/2-1203 (West 2010). Further, even if a party files a motion for extension of time to file a postjudgment motion, the circuit court loses jurisdiction over the case if it does not extend the deadline before the expiration of the 30-day period following the final judgment. *In re Estate of Kunsch*, 342 Ill. App. 3d 552, 554, 794 N.E.2d 1059, 106 (2003). Here, the circuit court did not rule on the plaintiff's motion to extend the time for filing a motion to reconsider until November 8, much more than 30 days after the entry of its final September 2 order. For these reasons, the circuit court lost jurisdiction over the case 30 days after September 2. Accordingly, the court's November 8 order was entered without jurisdiction and is a nullity. We therefore vacate our April 2012 order denying Hergan's motion to dismiss the plaintiff's appeal, and dismiss the plaintiff's appeal in case number 1-11-3731.

¶ 33    In case number 1-11-3179, the plaintiff raises several arguments challenging the circuit court's rejection of all of her claims against the defendants. The plaintiff first argues that the circuit court erred in granting the defendants' motion to dismiss counts III, IV, VI, and VII of her complaint. However, we agree with the defendants that the plaintiff's claims on these counts were barred by the doctrine of *laches*.

¶ 34    A defendant's assertion that a claim should be barred by *laches* invokes section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2010)), which provides for dismissal of a claim if it is barred by some affirmative matter. See *Knox v. Godinez*, 2012 IL App (4th) 110325, ¶¶ 5, 6. In ruling on a section 2-619 motion to dismiss, a court must interpret the pleadings and supporting materials in the light most favorable to the nonmoving party. *Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 332, 898 N.E.2d 631, 636 (2008). We review *de novo* a circuit court's decision to grant a section 2-619 motion to dismiss. *Abruzzo*, 231 Ill. 2d at 332, 898 N.E.2d at 636.

¶ 35    *Laches* is an equitable doctrine that precludes the assertion of a claim by a litigant whose unreasonable delay in raising that claim has prejudiced the opposing party. *Ulm v. Memorial Medical Center*, 2012 IL App (4th) 110421, ¶ 52. We note that, "[t]raditionally, the defense of *laches* was limited to actions arising in equity and was unavailable in actions at law." *Valdovinos v. Tomita*, 394 Ill. App. 3d 14, 18, 914 N.E.2d 221, 226 (2009). "Over time," however, "Illinois courts have expanded the application of the defense" so that it is now "routinely applied in lawsuits simultaneously seeking both legal and equitable remedies." *Valdovinos*, 394 Ill. App. 3d at 18, 914 N.E.2d at 226. Although there may still be

disagreement as to whether *laches* should apply in actions seeking only monetary damages (*Valdovinos*, 394 Ill. App. 3d at 18, 914 N.E.2d at 226 (citing cases)), this court has stated that "such 'mechanical' applications are no longer followed," even where a statute of limitations might otherwise apply (*Bill v. Board of Education of Cicero School District 99*, 351 Ill. App. 3d 47, 56, 58, 812 N.E.2d 604, 792, 793 (2004)). Although she seeks only monetary relief, and although statutes of limitation exist to govern the legal actions she has brought, the plaintiff makes no argument in her brief that the doctrine of *laches* should be inapplicable to this case. Given no reason to stray from the holding in *Bill*, we assume that a *laches* defense may be asserted here.

¶ 36    In order to succeed on a *laches* defense, a defendant must establish both (1) the plaintiff's lack of diligence in presenting her claim and (2) prejudice to the defendant as a result of the delay. *Ulm*, 2012 IL App (4th) 110421, ¶ 52. Here, the complaint, along with the defendants' motions to dismiss, establish both elements.

¶ 37    All four of the counts whose dismissal the plaintiff now challenges were based on the idea that the defendants conveyed to her an insufficient share of ownership in their ventures and that the ownership allocations of the ventures were "arbitrary" from the start. However, as even the plaintiff's complaint describes events, she was fully aware of her ownership share in 1998, when the ventures began. Her complaint describes her various and repeated entreaties to other owners to increase her share, as well as assurances she received that her share would be increased. However, it also establishes that she was aware at all times that her ownership share had not been increased and that she allowed the situation to persist for years with no official action from her co-owners.

¶ 38    In fact, the complaint states that she was shown documentation in 2004 and 2005 indicating that her ownership share had not been increased to her satisfaction, and, in her brief, the defendant notes that she was told in 2005 that Hergan and Proskine were uninterested in adjusting their ownership interests in the projects. Further, she knew that the owners failed to ratify a 2006 agreement that would have allowed her to convert some of her loan payments into equity in the ventures. Despite these clear signs, and despite the passage of time without an adjustment to her ownership stake, the plaintiff did not file suit until May 2008, 10 years after the disputed ownership allocations were first set out.

¶ 39    In the meantime, as the defendants pointed out in their motions to dismiss, the value of the ventures increased substantially. The plaintiff alleged that the combined value of the ventures at the time of her suit exceeded $500 million, far more than the contributions she alleges that she made to the companies. This remarkable increase in the value of the ventures underscores the prejudice the plaintiff's delay caused the defendants. By delaying her lawsuit, the plaintiff allowed the remaining owners to continue to participate in the ventures and create value on her behalf, while she withheld her decision as to whether to press for more equity. This type of delay is precisely the type that the doctrine of *laches* is designed to discourage. As another court has explained:

"A person may not withhold his claim awaiting the outcome of a doubtful enterprise and, after the enterprise has resulted in financial success favorable to the claimant, assert his interest, especially where he has thus avoided the risks of the enterprise. The injustice of

permitting one, holding the right to assert an interest in property of a speculative character, to voluntarily await the event and then decide, when the danger is over and the risk has been that of another, to come in and share the profit, is obvious. In such circumstances, persons having claims to property are bound to use the utmost diligence in enforcing them." *Pfister v. Cow Gulch Oil Co.*, 189 F.2d 311, 315 (10th Cir. 1951).

¶ 40   For these reasons, we conclude that *laches* bars the plaintiff's claims regarding her ownership allocation, and we agree with the circuit court's decision to dismiss counts II, IV, VI, and VII of her complaint.

¶ 41   The plaintiff next argues that the circuit court erred in dismissing her remaining claims against Proskine as a sanction for her failure to comply with discovery and for her possible misrepresentations to the court regarding her compliance. As the parties observe, Illinois Supreme Court Rule 219 (eff. July 1, 2002) empowers a court to impose sanctions against a party who violates discovery orders. "The appropriate sanction for a party's noncompliance with discovery rules is a matter within the broad discretion of the trial court, and absent an abuse of that discretion, its decision will not be disturbed on appeal." *Harris v. Harris*, 196 Ill. App. 3d 815, 819-20, 555 N.E.2d 10, 13-14 (1990).

¶ 42   Although the plaintiff asks us to evaluate the circuit court's application of its discretion to enter a sanction against her, the record includes only the circuit court's written orders compelling discovery and imposing sanctions. The plaintiff provides us with no record of the hearings that led to the sanctions against her, despite the fact that the order imposing sanctions seems to have been based largely on the plaintiff's counsel's conduct at one of those hearings. "[A]n appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92, 459 N.E.2d 958, 959 (1984). "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch*, 99 Ill. 2d at 392, 459 N.E.2d at 959. With no real record of the events that led to the sanctions against the plaintiff, we have no meaningful way to evaluate whether the circuit court's imposition of sanctions constituted an abuse of discretion. Under *Foutch*, we must resolve this ambiguity against the plaintiff. For that reason, we reject her argument that the circuit court erred in dismissing her claims against Proskine.

¶ 43   The plaintiff's final argument on appeal is that the circuit court erred in granting summary judgment in favor of Hergan on counts I, VIII, and IX of her complaint. Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). "The function of a reviewing court on appeal from a grant of summary judgment is limited to determining whether the trial court correctly concluded that no genuine issue of material fact was raised and, if none was raised, whether judgment as a matter of law was correctly entered." *American Family Mutual Insurance Co. v. Page*, 366 Ill. App. 3d 1112, 1115, 852 N.E.2d 874, 877 (2006). "The propriety of a trial court's decision to grant summary judgment presents a question of law, which we review *de novo*." *Bigelow Group,*

*Inc. v. Rickert*, 377 Ill. App. 3d 165, 168, 877 N.E.2d 1171, 1175 (2007).

¶ 44     To evaluate the circuit court's decision to grant summary judgment to Hergan on three counts of the complaint, we consider each count separately. We begin with count I, which alleged that Hergan breached a fiduciary duty to the plaintiff by failing to grant her greater equity in the ventures and by misrepresenting to her that her contributions would be treated as equity. To the extent these allegations are not barred by *laches* for the reasons discussed above, they are belied by the evidence presented in relation to Hergan's motion for summary judgment. With his motion for summary judgment, Hergan presented Proskine's testimony explaining the ownership allocation and noting that the plaintiff did not raise her objections until after the venture began to thrive, his own testimony that all the owners agreed to the ownership allocation, and documentary evidence supporting both accounts. In response, the plaintiff offered testimony from Wasendorf and herself. Wasendorf, however, offered no real knowledge about the plaintiff's ownership situation. The plaintiff's testimony also failed to contradict Hergan's and Proskine's accounts: it was limited to an explanation of her reasons for loaning money to Hergan. Pitted against Hergan's evidence, the plaintiff's motion for summary judgment did nothing to create a genuine issue of material fact regarding the first count of her complaint.

¶ 45     In count VIII of the complaint, the plaintiff alleged that Hergan violated a fiduciary duty to Rhombus and Central by issuing loans to friends, forging checks on company accounts, and purchasing a Hummer for personal use. The plaintiff now argues that, by these actions, Hergan used corporate assets to further his personal interests, at the corporation's expense. See *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 369, 643 N.E.2d 1206, 1217 (1994) ("a fiduciary's use of corporate assets to further his own goals is a violation of his fiduciary duties"). However, the plaintiff offered no evidence of any forged checks. As for the Hummer, Hergan offered his own testimony regarding the reasons the Hummer was purchased for the corporation, and the plaintiff offered nothing to rebut those reasons. Finally, as to the loans, all the plaintiff offered to establish their impropriety was a description of their terms. This alone is insufficient to establish their issuance as a breach of fiduciary duty. Thus, we agree with the circuit court that no genuine issue of material fact remained relating to count VIII of the complaint and that summary judgment in Hergan's favor was proper.

¶ 46     Finally, count IX of the complaint alleged that Hergan wasted corporate assets by issuing the loans and purchasing the Hummer. As we explained in relation to count VIII, however, the plaintiff offered nothing in her response to Hergan's motion for summary judgment to create a genuine issue of material fact regarding whether those actions were reasonable for the corporation.

¶ 47     For the foregoing reasons, we affirm the judgment of the circuit court in case number 1-11-3179 and dismiss the appeal in case number 1-11-3731.


¶ 48     No. 1-11-3179, Affirmed.

¶ 49     No. 1-11-3731, Dismissed.