# Illinois Official Reports

## Appellate Court

*Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887

| | |
|---|---|
| Appellate Court Caption | BETHANY YOUNG, Plaintiff-Appellee and Cross-Appellant, v. ALDEN GARDENS OF WATERFORD, LLC, Defendant-Appellant and Cross-Appellee (Patricia McCormick, Plaintiff; and The Alden Group, Ltd., Defendant). |
| District & No. | First District, Third Division<br>Docket Nos. 1-13-1887, 1-13-2105, 1-13-2424 cons. |
| Filed | March 31, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-13167; the Hon. Ronald Bartkowicz, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Law Offices of Chicago Kent, of Chicago (Laurie E. Leader and Rebecca Graham, of counsel), for appellant.<br><br>Law Office of Jeffrey Friedman, P.C. (Jeffrey Friedman, of counsel), and Leslie J. Rosen Attorney at Law, P.C. (Leslie J. Rosen, of counsel), both of Chicago, for appellee. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Presiding Justice Pucinski and Justice Hyman concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant-appellant Alden Gardens of Waterford, LLC, appeals from the judgment entered on a jury verdict finding it liable under the Illinois Whistleblower Act (740 ILCS 174/20 (West 2010)) for retaliating against a former employee, plaintiff-appellee Bethany Young, based on her refusal to engage in conduct that would have resulted in a violation of the law. On appeal, Alden Gardens contends that the trial court erred in denying its motion for summary judgment on the Whistleblower Act claim and in denying its motions for a directed verdict and judgment notwithstanding the verdict (judgment *n.o.v.*). Alden Gardens also argues that the verdict was the product of trial errors and was against the manifest weight of the evidence and on those grounds seeks a new trial. Finally, Alden Gardens disputes the amount of attorney fees awarded to counsel for Young. On cross-appeal, Young argues that the trial court erred in awarding her less than all of the attorney fees and costs sought. We find no error and affirm.

¶ 2                                    BACKGROUND

¶ 3    Alden Gardens, a licensed long-term care facility, employed Young as a registered nurse from January 10, 2008, to April 22, 2010. Young and coplaintiff Patricia McCormick, who was also employed at Alden Gardens, filed a complaint against Alden Gardens and The Alden Group, Ltd., alleging retaliation in violation of the Nursing Home Care Act (210 ILCS 45/3-810 (West 2010)) (count I), the Whistleblower Act (740 ILCS 174/30 (West 2010)) (count II) and common law retaliatory discharge (count III). McCormick has not appealed an adverse jury verdict and is not a party to this appeal.

¶ 4    The Alden Group is a holding company that owns stocks and other interests in various nursing home facilities, including Alden Gardens.[1] Alden Gardens is a sheltered care facility. Such facilities are for independent adults and residents have private apartments with kitchen facilities. In contrast, in a skilled nursing facility residents share rooms and the facility has hospital beds and provides more in-depth health care.

¶ 5                              A. The Amended Complaint

¶ 6    According to the amended complaint, from October 2009 to April 2010, Young and McCormick witnessed several instances of staff errors that jeopardized resident safety and constituted abuse or neglect of residents at Alden Gardens. As relevant to this appeal, one such instance occurred on November 20, 2009 when Young's supervisor, Sarah Werrline, directed Young to help her falsify residents' medication administration records. Young refused.

¶ 7    Young generally alleged that following the November 20, 2009 incident, her work hours were reduced, she was not offered available shifts, and her performance evaluation ratings declined. Young ultimately resigned on April 22, 2010. She claimed she was constructively discharged.

_____

[1]As The Alden Group was ultimately dismissed from the case, a ruling that Young has not appealed, this opinion will refer only to Alden Gardens as the defendant, except where necessary to distinguish between the two entities. Similarly, because McCormick has not appealed the adverse jury verdict, we will generally limit our discussion of the facts to those pertaining to Young and omit evidence particular to McCormick.

¶ 8    Although the amended complaint alleged other conduct by Young and McCormick directed at bringing shortcomings at Alden Gardens to the attention of the Illinois Department of Public Health (the Department), the trial court ultimately determined that those allegations were not relevant because both plaintiffs left Alden Gardens before Alden Gardens received formal notice of the Department's complaint. As Young does not challenge this limitation on the evidence presented at trial, we will not summarize those allegations here.

¶ 9                                  B. Procedural History

¶ 10    On May 29, 2012, after the close of discovery, trial was set for December 3, 2012; dispositive motions were due by July 20, 2012. On July 20, Alden Gardens filed a motion for summary judgment.

¶ 11    On November 19, 2012, the trial court granted Alden Gardens' motion for summary judgment in part. The court ruled in favor of Alden Gardens on count I, Young's claim for retaliation under the Nursing Home Care Act, finding that the Act's provisions then in effect afforded nursing home employees no private right of action for retaliatory discharge,[2] and on count III, the common law retaliatory discharge claim, as the common law does not permit recovery for a constructive discharge, but only for retaliatory termination of employment. The trial court denied summary judgment as to count II under section 20 of the Whistleblower Act (740 ILCS 174/20 (West 2010)) and the case proceeded to trial on that count.

¶ 12    At a pretrial conference, the trial court ruled that the discovery deposition of Nancy Tamul, a nurse employed at Alden Gardens at the time, would be treated as an evidence deposition. The record does not reflect the basis for the court's ruling. The court directed the parties to designate portions of Tamul's deposition to be read to the jury and later ruled on objections to the designations. The record does not reflect that Alden Gardens raised any issue regarding Tamul's availability to testify either before trial or before excerpts from Tamul's deposition were read to the jury.

¶ 13    The court also limited the evidence of retaliation that Young could rely on at trial to the incident involving her refusal to assist Werrline in falsifying residents' records and the claimed reduction in her work hours and responsibilities that followed. The court reasoned that although witnesses had testified to other incidents in various depositions, the only facts pled in the amended complaint related to the falsification of records and that it would be unfair to require Alden Gardens to defend against new factual allegations so close to trial. Thus, as framed by the amended complaint, Young's claim was limited to the contention that Alden Gardens reduced her work hours and responsibilities, resulting in her constructive discharge, in retaliation for her refusal to falsify residents' records.

¶ 14                                      C. Jury Trial

¶ 15    Trial commenced on December 3, 2012. Young testified that the nurses at Alden Gardens are responsible for, among other things, distributing and administering medications to the residents and performing diagnostic tasks. For those residents of Alden Gardens who are

---

[2]Effective July 29, 2010, the Nursing Home Care Act was amended to provide for a private right of action for nursing home employees. See 210 ILCS 45/3-810 (West 2010). The trial court found this amendment effected a substantive change in the law and, therefore, that it could not be applied retroactively to plaintiffs' claims.

diabetic, a physician normally orders monitoring of their blood glucose levels. Nurses are required to check the residents' blood glucose levels and administer insulin based on the results. Test results and the insulin given are entered into a blood glucose monitoring log, which is part of the resident's medical chart. The resident's physician makes recommendations for treatment based on the results of blood glucose tests as reflected in the log.

¶ 16    Werrline was hired as the wellness director for Alden Gardens in August of 2009. On November 20, 2009, Young notified Werrline that she had noticed that 10 to 20 entries in the blood glucose monitoring log for certain residents were missing from the previous night. In particular, several entries for each resident were missing. While Young did not know whether the blood glucose tests had, in fact, been done, she assumed the absence of entries meant that blood glucose levels for those residents had not been tested.

¶ 17    According to Young, she then observed Werrline filling in numbers in the blanks of the logs and putting other nurses' initials by the entries, including the initials of nurses who had not been scheduled to work the previous night. Werrline asked Young to help her fill in numbers and sign off on the log because Werrline did not want all the entries to be in her handwriting. Young refused and Werrline sighed, rolled her eyes, and continued to fill in the blanks.

¶ 18    Young testified she refused to comply with Werrline's request because it was illegal and it was a disservice to the residents, since a physician would be making recommendations for treatment based on the recorded glucose levels. Young knew from nursing school that it was illegal to fill in blanks in a patient's record with numbers that were not accurate.

¶ 19    On cross-examination, Young acknowledged that there is a difference between a blood glucose log and a medical administration record. In the blood glucose log, nurses document a resident's blood glucose level at different times during the day and record how much insulin was given to the resident. The medical administration record shows the medications given to the resident, apart from insulin. Young testified that both the blood glucose log and the medical administration record are contained in "the same book" and are part of a resident's "chart."

¶ 20    Young immediately reported Werrline's conduct to Alden Gardens' executive director, Rob Anderson. Young told Anderson that Werrline was falsifying medical records and had asked her to do the same but that she refused. Young also told Anderson that something should be done. Anderson advised Young to talk to Werrline and did not take any other action.

¶ 21    Thereafter, Young testified, her experience at Alden Gardens changed. Young's hours were reduced, she was no longer asked to fill in for shifts that were available, and she was no longer asked to train staff as she had done before. Nurses who were junior to Young in terms of their tenure at Alden Gardens were offered shifts before they were offered to Young, contrary to Young's past experience. At the time of the November 2009 incident, Young was working 30 to 40 hours a week. After November 2009, the amount of hours declined and continued to do so to the point that in April 2010, she was working only two eight-hour shifts per week. Additionally, Young testified that before the November 2009 incident, she had received glowing work performance evaluations, but after the incident, Werrline gave her an evaluation that was, while not negative, not as favorable as previous evaluations.

¶ 22    Young testified she stayed at Alden Gardens after the November 2009 incident because she needed the money and because she felt that she could help the residents by protecting them from the danger posed by the actions of Werrline and other staff members. She testified that this time period was stressful, that she could not sleep, and when she did sleep, she had

nightmares. She also experienced anxiety at work and felt that her nursing license was possibly in jeopardy.

¶ 23 During her tenure at Alden Gardens, Young was making $27.56 an hour. On cross-examination, Young acknowledged that she started looking for a job after the November 2009 incident but she did not take another job until she began working part-time in April 2010, earning $25 an hour. She took a different full-time position in June 2010, which paid $22.50 an hour.

¶ 24 Excerpts from Tamul's deposition were read to the jury. Tamul, a nurse with 48 years' experience, was employed at Alden Gardens from September 2009 through April 2012. Tamul observed what she considered to be retaliation against Young. Young's hours were cut, although Young asked Werrline for more hours. Tamul testified that Werrline treated Young differently after the November 2009 incident, specifically, "she was very disrespectful, denigrating, loud, rude, had no respect for anyone's privacy. It was done in the middle of the office in front of everyone, very inappropriate." Additionally, Tamul noticed several staff and management errors, such as inadequate documentation in the charts and medication administration errors.

¶ 25 Danette Temple is the staffing development coordinator at Alden Management Services, a consulting entity that provides support services to long-term facilities, such as payroll services and assisting in developing policies and procedures. Temple testified that in her role as the staffing development coordinator, she was responsible for staff education for the various facilities Alden Management Services contracts with, including Alden Gardens. Temple provides education and training to nurses and administration on nursing policies, procedures, and nursing standards.

¶ 26 At trial, Temple claimed to be unable to state whether falsifying information on a blood glucose chart violated the law. She was impeached with her deposition in which she admitted that making false entries in a resident's medical record is a violation of Illinois law. Further, although late entries are not uncommon, Temple acknowledged that it also violates Illinois law for a nurse to fail to note on the record that an entry is a late entry. Temple also admitted that blood glucose test results dictate what medications a physician may order for the patient and that if those results are documented incorrectly or if they are not taken, the physician does not have the necessary information to make the appropriate medical orders for that resident.

¶ 27 After the close of Young's case, Alden Gardens moved for a directed verdict, arguing that Young did not establish a *prima facie* case under the Whistleblower Act. Alden Gardens' motion was denied. The following day, the court dismissed The Alden Group as a party defendant based on the lack of evidence that The Alden Group exercised control over Alden Gardens.

¶ 28 To rebut Young's claim that her hours were reduced, Alden Gardens called Vincent Cozzi, the payroll coordinator for Alden Management Services. Basing his testimony on Young's payroll check register, Cozzi calculated that during 2008, Young worked an average of 38.78 hours per two-week pay period. Young worked an average of 58.80 hours per pay period during 2009. In 2010, from January 1 through April, Cozzi calculated that Young worked 54.22 hours on average per pay period. Cozzi acknowledged that although Young worked 63 hours during the pay period ending on January 13, 2010, by April 2010, Young worked 35 hours during one pay period, and her last paycheck of May 5, 2010, showed that Young worked just 26 hours in the pay period before she resigned.

¶ 29 The jury was instructed that in order to prevail, Young was required to show, among other things, that the conduct Werrline asked her to engage in would have violated "a state or federal law, rule or regulation." The instruction did not reference, nor did Alden Gardens tender, a proposed instruction referencing any particular law, rule or regulation. Counsel for Alden Gardens argued to the jury that Young failed in this element of her proof because the evidence was insufficient to show that the information Werrline was entering in residents' medical records was false.

¶ 30 On the issue of damages, counsel for Young asked for $20,000 to $40,000 for lost income and damages for emotional distress in the range of $100,000 to $200,000. Counsel for Alden Gardens argued that there was no "objective basis" for the calculation of damages and, therefore, none should be awarded.

¶ 31 After the jury was instructed, the trial court did not provide the parties' exhibits to the jury, noting that it generally did not allow exhibits to go back to the jury room. Counsel for Alden Gardens responded, "I'm fine with that, your Honor, not sending them back."

¶ 32 During deliberations, the jury sent out two notes. The first asked for a copy of the exhibit used during Cozzi's testimony relating to the number of hours Young worked; the second asked for a copy of all of the exhibits. There are no transcripts of hearings held with respect to the jury's requests. In its brief, Alden Gardens represents that the trial court indicated a willingness to send all exhibits to the jury room, but counsel for Alden Gardens objected to providing the jury with all of the exhibits. When the parties could not agree to provide the jury with all exhibits, the trial court determined that no exhibits would be sent to the jury and instructed the jury to continue deliberating.

¶ 33 The jury returned a unanimous verdict in favor of Young and against Alden Gardens on the claim for retaliation under section 20 of the Whistleblower Act. 740 ILCS 174/20 (West 2010). The jury answered two special interrogatories propounded by Alden Gardens in the affirmative: (1) whether Young was retaliated against for her refusal to engage in conduct that would have violated a state or federal law, rule or regulation and (2) whether the retaliation proximately caused the termination of Young's employment. The jury assessed damages for lost income in the amount of $7,165 and emotional distress and mental anguish damages in the amount of $41,560, for a total award of $48,725.

¶ 34 Alden Gardens filed a posttrial motion seeking judgment *n.o.v.* or, in the alternative, a new trial, arguing that Young failed to prove her case. Alden Gardens contended that the trial court erred in denying its motion for summary judgment and that it was entitled to judgment *n.o.v.* because Young failed to prove essential elements of her claim under the Whistleblower Act. Alden Gardens sought a new trial on the ground that the jury's verdict was contrary to the manifest weight of the evidence and that certain of the court's rulings during trial were erroneous and prejudicial. Alden Gardens also sought a remittitur of the damages awarded by the jury. The trial court denied the motion.

¶ 35 Following entry of judgment on the verdict, Young originally sought $217,593.75 in attorney fees and costs pursuant to section 30 of the Whistleblower Act (740 ILCS 174/30 (West 2010)), an amount later increased to $385,512.21. The trial court conducted a hearing on fees over three days and eventually awarded Young $77,137 in attorney fees and $3,220 in costs. We discuss in more detail below the facts relevant to Young's fee petition.

¶ 36 Alden Gardens timely appealed. Young cross-appealed the award of fees.

¶ 37                                  ANALYSIS

¶ 38        With respect to the judgment in Young's favor, Alden Gardens argues that: (1) it was entitled to summary judgment on Young's claim under the Whistleblower Act because Young failed to identify a law, rule or regulation that would have been violated by the conduct she refused to perform, and thus the trial court erred in allowing Young to proceed to trial on what it characterizes as an "unpled claim"; (2) the trial court should have granted judgment *n.o.v.* because the proof at trial was insufficient for the same reason and because Young failed to prove retaliation; (3) the jury's verdict was against the manifest weight of the evidence; (4) errors during the trial, including the admission of excerpts from Tamul's discovery deposition and the trial court's refusal to provide exhibits to the jury, denied Alden Gardens a fair trial; and (5) the award of damages is excessive and unsupported by the evidence. We find Alden Gardens' contentions of error to be without merit.

¶ 39                             A. Standard of Review

¶ 40        Alden Gardens challenges a number of trial court rulings including the denial of its motions for summary judgment, for a directed verdict and for judgment *n.o.v.* or a new trial. As Alden Gardens' contentions of error regarding these rulings focus on common issues relating to Young's claimed failure to establish essential elements of her Whistleblower Act claim, we summarize the standard of review applicable to each of these rulings here.

¶ 41        Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). While a plaintiff need not prove its case at the summary judgment stage, plaintiff must present enough evidence to create a genuine issue of fact. *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010). Our review of an order granting summary judgment is *de novo*. *American Service Insurance Co. v. Jones*, 401 Ill. App. 3d 514, 520 (2010).

¶ 42        Generally, when a case proceeds to trial after a motion for summary judgment is denied, the order denying the motion for summary judgment merges with the judgment entered and is not appealable. *Labate v. Data Forms, Inc.*, 288 Ill. App. 3d 738, 740 (1997) (citing *Battles v. La Salle National Bank*, 240 Ill. App. 3d 550, 558 (1992)). An exception exists where the issue raised in the summary judgment motion presents a question of law and, therefore, would not be decided by the jury. *Id.* In that case, the denial of a summary judgment motion does not merge with the judgment and may be addressed on appeal under *de novo* review. *Id.*; *Jones*, 401 Ill. App. 3d at 520.

¶ 43        Here, the denial of summary judgment does not merge into the judgment because the issue raised in the motion–whether Young identified a law, rule or regulation that would have been violated had she engaged in the conduct refused–was a question of law that was not before the jury. Thus, we review *de novo* the denial of Alden Gardens' motion for summary judgment. *Battles*, 240 Ill. App. 3d at 558; *Jones*, 401 Ill. App. 3d at 520.

¶ 44        A directed verdict or judgment *n.o.v.* should be entered only where "all of the evidence, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based on that evidence could stand." *Addis v. Exelon Generation Co.*, 378 Ill. App. 3d 781, 786 (2007). The trial court's decision to deny a motion for directed verdict is reviewed *de novo*, as is the decision denying a motion for judgment *n.o.v. Brannen v. Seifert*, 2013 IL App (1st) 122067, ¶ 59.

¶ 45    The standard for obtaining a judgment *n.o.v.* is a " 'very difficult standard to meet,' " and limited to " 'extreme situations only.' " *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1125 (2000) (quoting *People ex rel. Department of Transportation v. Smith*, 258 Ill. App. 3d 710, 714 (1994)). " '[I]t is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony.' " *Velarde v. Illinois Central R.R. Co.*, 354 Ill. App. 3d 523, 537 (2004) (quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992)). "The [trial] court has no right to enter a judgment *n.o.v.* if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." (Internal quotation marks omitted.) *Id.* (quoting *Maple*, 151 Ill. 2d at 454).

¶ 46    When a trial court rules on a motion for a new trial, the court weighs the evidence and determines if the jury's verdict is contrary to the manifest weight of the evidence. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 38. "A verdict is against the manifest weight of the evidence only where the opposite result is clearly evident or where the jury's findings are unreasonable, arbitrary and not based upon any of the evidence." *Id.* On review, this court will not reverse the trial court's ruling on a motion for a new trial unless the moving party affirmatively shows the trial court abused its discretion. *Velarde*, 354 Ill. App. 3d at 537-38. "In determining whether the trial court abused its discretion, the reviewing court should consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial." *Maple*, 151 Ill. 2d at 455.

¶ 47           B. Evidence Regarding a Violation of Law, Rule or Regulation

¶ 48    To prevail on a claim under section 20 of the Whistleblower Act, a plaintiff must establish that (1) she refused to participate in an activity that would result in a violation of a state or federal law, rule or regulation and (2) her employer retaliated against her because of the refusal. 740 ILCS 174/20 (West 2010); *Sardiga v. Northern Trust Co.*, 409 Ill. App. 3d 56, 61 (2011). Several of Alden Gardens' arguments relate to Young's failure to indentify a particular "law, rule or regulation" that would have been violated had she acceded to Werrline's request to assist her in falsifying the blood glucose logs. On this point, Alden Gardens contends that (i) its motion for summary judgment should have been granted, (ii) it should have prevailed on its motions for a directed verdict and for judgment *n.o.v.*, and (iii) the jury's verdict is contrary to the manifest weight of the evidence, all because Young failed to identify a state or federal law, rule or regulation to support her claim under the Whistleblower Act.

¶ 49    While it is true that a plaintiff under the Whistleblower Act must identify a law, rule or regulation that her employer asked her to violate (see *Ulm v. Memorial Medical Center*, 2012 IL App (4th) 110421, ¶ 36 ("Plaintiff fails to cite a law she would have violated by making a certification to accompany a subpoenaed medical record stating the record was complete, accurate, and made in the regular course of defendant's business.")), Alden Gardens' contention that Young failed in this element of proof is specious. Young testified both in her deposition and at trial that falsifying a resident's medical records was against the law and that she believed that assisting Werrline in that effort could jeopardize her nursing license. In her trial testimony, Temple, a nurse responsible for educating and training staff members at The Alden Group's nursing homes, corroborated Young's belief. That Young was correct on this point is supported not only by the law, but also by common sense.

¶ 50    Under the Nurse Practice Act, the Department of Financial and Professional Regulation may suspend or revoke a nurse's license based on "dishonorable, unethical or unprofessional conduct," which includes gross negligence in the practice of nursing, the "[f]ailure to establish and maintain records of patient care and treatment as required by law," and "[w]illfully making or filing false records or reports in the [nurse's] practice." 225 ILCS 65/70-5(a), (b)(7), (b)(14), (b)(19), (b)(22) (West 2010). Falsifying a patient's medical record with fabricated results of blood glucose tests would have warranted revocation of Young's license under the foregoing provisions and Werrline's request that Young assist her in that effort clearly solicited Young to engage in conduct that was illegal. *Id.*

¶ 51    Alden Gardens argues that in opposition to its motion for summary judgment, Young relied on a provision of the Administrative Code (77 Ill. Adm. Code 300.1610(d) (2003)) applicable to skilled nursing facilities and that since Alden Gardens is a sheltered care facility, the cited provision was insufficient to satisfy the first element of Young's claim. But our review of the record reveals that Alden Gardens did not advance this argument in connection with its motion for summary judgment; rather, Alden Gardens argued that the cited provision of the Administrative Code applied to the nursing facility itself and not to the nurses who worked there and that, at most, the regulation established a standard of care, the violation of which would not necessarily be "illegal." We conclude that no matter how Alden Gardens casts this argument, it is without merit.

¶ 52    Specifically, Young cited section 300.1610(d) of Title 77 of the Administrative Code regarding the obligations of a skilled nursing facility to maintain resident medical records. 77 Ill. Adm. Code 300.1610(d) (2003). Although it contends here that this provision does not apply to sheltered care facilities, Alden Gardens fails to note that the Administrative Code imposes on sheltered care facilities virtually the same duties with respect to residents' medical records as those which govern skilled nursing facilities. 77 Ill. Adm. Code 330.1710 (1999). Both provisions require nursing homes, regardless of the level of care they provide, to keep current and complete medical records for residents and that entries in a resident's medical record "shall be made by the person providing or supervising the service or observing the occurrence that is being recorded" and authenticated by the individual who made or authored the entry. The manner in which Werrline asked Young to help her fill in the blanks of residents' medical records violated these provisions. Even if Alden Gardens had preserved the issue, the fact that Young may have cited the wrong provision of the Administrative Code to support her contention did not warrant summary judgment in Alden Gardens' favor.

¶ 53    Further, although this evidence was not introduced at trial, the record reveals that McCormick, assisted by Young, filed a complaint with the Illinois Department of Public Health, which the Department later investigated. Finding numerous violations, including several in connection with the maintenance of residents' medical records in violation of section 330.1710 of Title 77 of the Administrative Code (77 Ill. Adm. Code 330.1710 (1999)), the Department in July 2010 issued Alden Gardens a conditional license and fined the facility $10,000. Given this undisputed evidence, the contention that Alden Gardens was hampered in its defense or Young failed in her proof because she did not identify a law requiring a nursing home to maintain accurate medical records for its residents borders on frivolous.

¶ 54    Alden Gardens' further contention that Young and Temple were not competent to testify to the illegality of falsifying medical records is similarly without merit. Both Young and Temple, as nurses holding professional licenses, were competent to testify that falsifying a patient's

medical record was against the law. Alden Gardens' contrary argument is not adequately developed on appeal and we therefore reject it. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008); *Lake County Grading Co. v. Village of Antioch*, 2014 IL 115805, ¶¶ 35-36 (plaintiff forfeited review of an issue where the argument was undeveloped, it occupied less than one page of its brief, and no supporting authority was cited).

¶ 55     Alden Gardens' argument that the trial court allowed Young to proceed to trial on an unpled claim is contrary to the record. The incident of November 20, 2009, where Young alleged that she refused to falsify medical administration records, is alleged in the amended complaint filed on July 23, 2011. Young also specifically alleged retaliation for her "refusal to engage in improper practices." Although Young's allegations in her claim under the Whistleblower Act also detailed claimed retaliation for reporting illegal activities at Alden Gardens under section 15 of the Whistleblower Act (a claim that the jury was not permitted to decide), the amended complaint's allegations advised Alden Gardens that one of the bases for Young's claim involved her refusal to comply with Werrline's demand to falsify medical records.

¶ 56     Alden Gardens argues that the trial court erred when it construed Young's claim under the Whistleblower Act as predicated on section 20 of the Act, which was not specifically pled in the complaint. But the complaint alleges a claim for retaliation in violation of the Whistleblower Act pursuant to section 30. Section 30 provides that an employee may bring an action against the employer if the employer takes any action against an employee in violation of section 15 or section 20. 740 ILCS 174/30 (West 2010). We find it sufficient, as the trial court did, that Young alleged that she is entitled to recovery pursuant to section 30 for a violation of section 15 or section 20 of the Whistleblower Act, especially given that Young specifically alleged that she was constructively discharged from her employment because of her refusal to follow Werrline's request to falsify medical records. Young thus adequately pled a violation of the Whistleblower Act based on retaliation by Alden Gardens for her refusal to engage in conduct that would have been in violation of a law, rule or regulation under section 20 of the Whistleblower Act.

¶ 57     With respect to its argument that the jury's verdict is contrary to the manifest weight of the evidence, Alden Gardens argues that the evidence was insufficient to support the conclusion that Werrline was, in fact, entering false information in residents' records. Alden Gardens persists in arguing here, as it did to the jury, that Young did not see whether Werrline was, for example, copying test results from other information and did not know whether Werrline had contacted the nurses on duty the previous evening to obtain information from them. Thus, Alden Gardens contends it is possible that Werrline was not asking Young to violate the law, but merely sought help filling in accurate information. But such inferences were for the jury to draw and given Young's uncontradicted testimony that Werrline solicited her help so that all the handwriting would not be the same, the conclusion that Werrline was, as Young suspected, fabricating test results is amply supported by the record. Indeed, in light of the evidence at trial coupled with Alden Gardens' failure to call either Werrline or Anderson (both of whom were later terminated by Alden Gardens) to dispute Young's account, the trial court could have properly instructed the jury that Alden Gardens, through Werrline, asked Young to engage in conduct in violation of the law, leaving the jury to decide only whether Alden Gardens retaliated against Young as a result of her refusal.

¶ 58    All of Alden Gardens' arguments regarding Young's supposed failure to establish that her employer requested her to violate the law are based on a strained reading of Young's amended complaint and a distorted view of the evidence in the record. This element of Young's Whistleblower Act claim was supported by the evidence adduced before and during trial. Therefore, Alden Gardens' various requests for relief premised on the claimed lack of proof that it, through Werrline, requested Young to participate in an activity that would violate a state or federal law, rule or regulation were properly rejected.

¶ 59                    C. Evidence Regarding Retaliation

¶ 60    A reasonable jury could have also concluded that Alden Gardens retaliated against Young for her refusal to engage in the unlawful activity. Young testified that after the November 2009 incident, her hours decreased. While she had been working 30 to 40 hours per week before the November 2009 incident, by April 2010, she was working 16 hours per week. Although Alden Gardens cross-examined Young and offered testimony from Cozzi to contradict this aspect of Young's retaliation claim, even Cozzi had to admit that Young worked on average fewer hours in 2010 than she did in 2009 and that, by April, Young was only working two shifts per week. Further, Cozzi offered no testimony that all nurses at Alden Gardens worked fewer hours during 2010, so there is no support in the record for an argument that the reduction was not aimed at Young in particular.

¶ 61    Young also testified that she was no longer asked to fill in for shifts that were available, although she requested them. Nurses with less seniority were offered shifts before Young, contrary to her past experience. Tamul's testimony also corroborated Young on this point. Tamul testified that she observed Werrline treat Young differently after the November 2009 incident, and she also observed Young's hours decline. It was for the jury to decide whether the decline in Young's hours was related to her refusal to falsify residents' medical records.

¶ 62    Further, the decline in the number of hours Young worked was not the only form of retaliation supported by the evidence. Young also testified that she was no longer asked to train staff as she had done in the past and that before the November 2009 incident, she had received glowing work performance evaluations, but after the incident, Werrline gave her an evaluation that was less favorable than previous evaluations.

¶ 63    Based on this evidence, and given it was the province of the jury to determine the credibility of the witnesses, a reasonable jury could have concluded that Alden Gardens retaliated against Young for her refusal to participate in unlawful activity. The jury had before it evidence that Young worked fewer hours at the end of her tenure at Alden Gardens, that certain duties were taken away, that her work evaluations were not as favorable as previous evaluations, and that she was treated differently than she had been before the incident. The testimony therefore supports the jury's conclusion that Alden Gardens was guilty of retaliation.

¶ 64    It bears noting that Alden Gardens tendered two special interrogatories specifically directed at both the "violation of law" and "retaliation" elements of Young's Whistleblower Act claim. The jury's affirmative answer to both interrogatories underscores the sufficient basis for the verdict in Young's favor.

¶ 65                                    D. Trial Errors

¶ 66        Alden Gardens also complains of errors during the trial, which it claims denied it a fair trial. "A new trial is necessary when the cumulative effect of trial errors so deprives a party of a fair trial that the verdict might have been affected." *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 47 (2010). Decisions on the admission or exclusion of evidence are reviewed for an abuse of discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003); *Simmons v. Garces*, 198 Ill. 2d 541, 567 (2002) (citing *Taluzek v. Illinois Central Gulf R.R. Co.*, 255 Ill. App. 3d 72, 83 (1993)). Similarly, the general rule is that the trial court has considerable discretion in determining whether an exhibit may be taken into the jury room, which will not be disturbed unless there was an abuse of discretion to the prejudice of defendant. *Becht v. Palac*, 317 Ill. App. 3d 1026, 1039-40 (2000) (citing *People ex rel. Department of Transportation v. Smith*, 258 Ill. App. 3d 710, 717 (1994), and *Merlo v. Parisi*, 255 Ill. App. 3d 53, 61 (1993)). The party seeking reversal bears the burden of establishing prejudice as a result of the claimed errors and reversal is warranted only where the prejudice is substantial and affected the outcome of the case. *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 848 (2010).

¶ 67        Before we can address Alden Gardens' claimed errors, we must have before us an adequate record. The appellant has the burden to present a complete record on appeal to support its claims of error. *Balough v. Northeast Illinois Regional Commuter R.R. Corp*., 409 Ill. App. 3d 750, 770 (2011) (citing *Foutch v. O'Bryant*, 99 Ill. 2d 389, 393 (1984)). Absent an adequate record, there is no basis upon which to determine whether the trial court abused its discretion in its rulings. *In re Marriage of Blinderman*, 283 Ill. App. 3d 26, 34 (1996). If we are not provided with a complete record, we must presume that the order entered by the trial court was in conformity with the law and had a sufficient factual basis. *Foutch*, 99 Ill. 2d at 391-92; see also *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 157 (2005) ("Without an adequate record preserving the claimed error, the reviewing court must presume the circuit court had a sufficient factual basis for its holding and that its order conforms with the law.").

¶ 68        First, Alden Gardens contends that the trial court improperly allowed Tamul's discovery deposition testimony to be used as evidence without proof of Tamul's unavailability. The record reflects that the court ordered that the discovery deposition of Tamul be treated as an evidence deposition during a pretrial conference on November 28, 2012. Although Alden Gardens argues that it objected to the introduction of Tamul's deposition at this hearing, it has not provided a transcript or bystander's report of the hearing. Thus, we have no way of determining whether, in fact, Alden Gardens objected and, if so, the basis for the trial court's ruling.

¶ 69        Alden Gardens also contends that it objected again to the use of the deposition before it was read to the jury. But Alden Gardens misrepresents the only objection for which there is a record. Alden Gardens' objection was not based on Young's failure to demonstrate Tamul's unavailability; rather, the only objections raised by Alden Gardens focused on the substance of the designated portions of Tamul's deposition testimony. In fact, the record shows that counsel for Alden Gardens cooperated with opposing counsel in determining what sections of the deposition could be read to the jury. The trial court addressed each objection and counter-designation by Alden Gardens, ruling that certain sections of the deposition be stricken. During trial, without objection from Alden Gardens, Young's counsel was allowed to read excerpts from Tamul's deposition to the jury.

¶ 70     The only objection relating to Tamul's unavailability raised by Alden Gardens was after Young rested. When counsel for Young objected to the substitution of a witness for Alden Gardens because he had not received an affidavit that the witness originally identified was unavailable, counsel for Alden Gardens argued that Young had not provided an affidavit that Tamul was unavailable. This belated observation is not sufficient to preserve this claimed error for review.

¶ 71     Timeliness requires that an objection be made when the evidence is offered at trial. *Spurgeon v. Mruz*, 358 Ill. App. 3d 358, 360 (2005). Although a party may have objected to the evidence at some pretrial stage in the proceedings or unsuccessfully moved to bar the evidence prior to trial, it must still renew its objection at the time that the evidence is offered. *Id.* at 360-61. Failure to renew the objection when the evidence is offered at trial results in forfeiture of the ability to challenge the trial court's consideration of that evidence. *Id.* at 361; *Scassifero v. Glaser*, 333 Ill. App. 3d 846, 855-56 (2002).

¶ 72     Even if we assume Alden Gardens made an objection during a hearing on a motion *in limine* or moved to bar Tamul's deposition (the record does not reveal that it did either), Alden Gardens forfeited its argument when it failed to renew its objection to the evidence when the deposition was read to the jury at trial. *People v. Denson*, 2014 IL 116231, ¶ 19 (in civil cases, a contemporaneous objection to the evidence at the time it is offered is required to preserve the issue for review). It was not until after Young rested that Alden Gardens first raised any issue regarding Tamul's unavailability. Therefore, Alden Gardens has forfeited this issue on appeal. *Gallagher v. Lenart*, 226 Ill. 2d 208, 229 (2007) ("Rather than an intentional relinquishment of a known right, forfeiture is the failure to make the timely assertion of the right." (Internal quotation marks omitted.) (quoting *People v. Blair*, 215 Ill. 2d 427, 444 n.2 (2005))).

¶ 73     Alden Gardens next argues that the trial court abused its discretion when it refused to provide the jury with requested exhibits. As noted above, during its deliberations, the jury requested to see the exhibit showing Young's payroll information used by Cozzi during his testimony. The jury also requested to see copies of all of the exhibits.

¶ 74     Alden Gardens points to an off-the-record conference where the trial court advised the parties that either all of the exhibits would be sent to the jury or none at all. Because the parties could not agree on all of the exhibits being sent to the jury, the trial court simply instructed the jury to keep deliberating. Alden Gardens argues the trial court abused its discretion in failing to provide the jury with "critical" exhibits and that it was prejudiced by this ruling.

¶ 75     But as Young points out, there is again no record of what occurred at this conference because Alden Gardens has not provided a bystander's report. Thus, we must assume that the trial court properly exercised its discretion and that its ruling was in accordance with the law. *Foutch*, 99 Ill. 2d at 391-92.

¶ 76     Alden Gardens contends that the jury's request for the payroll exhibit shows that the jury had questions regarding the claimed reduction in Young's work hours following the November 2009 incident and that the jury's examination of this exhibit would have refuted this claim. This is pure speculation. We have examined the exhibit and do not agree with Alden Gardens' characterization of the information it contains. The exhibit shows a steady, although not precipitous or immediate, reduction in Young's work hours during 2010. Further, it is just as likely that the jury wanted to see the exhibit so that it could accurately calculate Young's lost wages. As it is, the record reflects that the jury must have engaged in a detailed calculation of

lost wages since it awarded the sum of $7,165 for this item of damages, well below the range requested by Young's counsel ($20,000 to $40,000). The jury also calculated a precise figure, leading to the conclusion that the jury fulfilled its role to award only those damages supported by the evidence.

¶ 77 Furthermore, even assuming that Alden Gardens accurately characterizes the trial court's position as an "all or nothing" approach to providing exhibits to the jury, there is nothing "capricious" in this decision. Trial courts generally attempt to avoid having jurors single out a particular exhibit. Certainly if Alden Gardens felt it was essential for the jury to see its payroll exhibit, it could have accomplished that by agreeing to have the jury view all of the exhibits. Consequently, the trial court did not abuse its discretion and Alden Gardens was not prejudiced by the trial court's failure to provide this single exhibit to the jury. Finding no trial error, it follows that Alden Gardens' request for a new trial on this basis must be rejected.

¶ 78                                 E. The Jury's Damage Calculation

¶ 79 Alden Gardens contends the evidence did not support the jury's award of $7,165 in actual damages and $41,560 in emotional damages. Alden Gardens asks that this court order a remittitur, but does not specify what portion of the jury's verdict constitutes excessive damages nor does it specify what portion of the award should be reduced. In fact, Alden Gardens' main argument is not that the damages awarded should be reduced by way of remittitur but, rather, that the jury's verdict on damages should be set aside because the amount of damages awarded is unsupported by the evidence adduced at trial.

¶ 80 The determination of damages is a question reserved for the trier of fact, and, as a reviewing court, we give great deference to a jury's damage award. *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997); *Estate of Oglesby v. Berg*, 408 Ill. App. 3d 655, 661-62 (2011). "An award of damages will be deemed excessive if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that is shocks the judicial conscience." *Richardson*, 175 Ill. 2d at 113. Where the jury's award falls within the flexible range of conclusions reasonably supported by the evidence, a remittitur should not be granted. *Martinez v. Elias*, 397 Ill. App. 3d 460, 474 (2009) (citing *Kindernay v. Hillsboro Area Hospital*, 366 Ill. App. 3d 559, 572 (2006)). We review a trial court's ruling on a motion for remittitur for an abuse of discretion. *Berg*, 408 Ill. App. 3d at 661; *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13, 45 (2009).

¶ 81 Alden Gardens repeats the same arguments here as to lack of evidence that Young was retaliated against and that Young's hours were reduced. But, as discussed above, the jury's decision falls within the flexible range of conclusions reasonably supported by the evidence presented at trial. Young worked fewer hours in 2010 than she did in 2009, even by Cozzi's account. She also eventually accepted a position that paid less per hour than her hourly rate while she was at Alden Gardens. Given this undisputed evidence, we can find no basis to second-guess the jury's calculation of lost wages.

¶ 82 We also reject Alden Gardens' argument that there was no factual support or competent evidence for the award of $41,560 for emotional damages. Bearing in mind that determination of the amount of damages is a function reserved for the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered, we cannot say that the trial court abused its discretion in denying Alden Gardens' motion for a remittitur on this aspect of the jury's damage award. Young testified that during the five months between her refusal to falsify

records in November 2009 and her resignation in April 2010, she experienced stress, had trouble sleeping, experienced nightmares and increased anxiety at work, and felt that her nursing license was in jeopardy. She sought help from the executive director of the facility and was told to talk to the perpetrator. Alden Gardens elicited no contradictory testimony at trial and simply argued to the jury that it should award no damages. Because we cannot say that the jury's findings are unsupported by the evidence, we find the trial court did not abuse its discretion in denying remittitur of Young's damage award.

¶ 83                    F. Attorney Fees Awarded to Counsel for Young

¶ 84    As noted, Young's counsel originally filed a fee petition seeking an award of $217,593.75 in fees and $3,185 in costs. Young also sought $18,366.33 representing the fees and expenses of another law firm that assisted in the preparation of the petition and supporting memorandum. Young later sought additional fees incurred in preparing for and participating in the hearing on the petition, ultimately seeking a total of approximately $385,000 (comprising a nearly 40% increase in the fee originally sought). After a multiday evidentiary hearing, the trial court determined that Young's lawyers were entitled to $77,137 in attorney fees and $3,220 in costs. The court found that Young's attorneys were entitled to compensation at a blended rate of $412.50 per hour for 187 hours of work on Young's case utilizing the court's recollection of in-court time and its calculation of the time it deemed reasonable in connection with pretrial proceedings, including discovery and motion practice. Both parties challenge the award on a number of grounds.

¶ 85    Prior to addressing the legal issues presented with respect to the fee award, we note that the disproportionate relationship between the fees sought–particularly those incurred between the date the original petition was filed and the date of the award–and the amount of Young's recovery is equally attributable to unreasonable conduct by counsel for both parties. As we have detailed above, the evidence showed that Young was asked by Werrline to engage in conduct that was illegal. Yet, despite the fact that (i) both Werrline and Alden Gardens' executive director were later fired and were not called at trial to dispute Young's account and (ii) the Department later fined and issued Alden Gardens a conditional license precisely because of the types of violations revealed by Young, Alden Gardens persisted in aggressively litigating, including in this appeal, this element of Young's Whistleblower Act claim. There is a point when an aggressive defense crosses over into obstinacy, and our review of the record convinces us that defense counsel crossed that line. And while Alden Gardens was entitled to litigate every issue in the case through trial and on appeal, it can hardly be surprised that its "no holds barred" defense resulted and continues to result in a correspondingly greater expenditure of time by Young's counsel. So from this vantage point, we have little sympathy for Alden Gardens' criticism of the time spent by Young's counsel in litigating her claim.

¶ 86    But our sympathy for the difficulties faced in the prosecution of Young's claim must be tempered by equally problematic conduct on the part of Young's counsel, particularly in connection with the fee petition. We discuss at some length the petition's shortcomings to illustrate the difficulty of the task faced by the experienced trial judge in determining an appropriate fee.

¶ 87    The fee petition filed by Young's counsel in this case suffered from a number of substantial defects. First, counsel failed to keep contemporaneous time records, although they claimed to be experienced in similar litigation and thus would be presumed to recognize the importance of

maintaining accurate records of services rendered in a case with the potential for a fee award. Young's counsel only began maintaining time records after the verdict in favor of Young. Consequently, counsel were required to reconstruct time spent in litigating Young's claims to verdict, a fact not readily apparent from the face of the petition. The result was that the description of services rendered was, for many entries, generic, listing, for example, such services as "discuss case during lunch," "discuss pretrial," "drafting/research" on unspecified topics and the like. The reconstructed time entries frequently listed bundled descriptions of services, including multiple tasks under one time entry, thus rendering it impossible for the trial court to determine whether the time spent on any particular task was reasonable. The petition also charged attorney rates for services such as delivering courtesy copies to the trial judge's chambers, assembling and filing documents in the case, making a trip to Office Depot to purchase binders for trial exhibits and copying those exhibits. Finally, not a single invoice substantiating the costs requested was attached to the petition.

¶ 88    Second, Young's counsel took the position that even though McCormick's claim was unsuccessful, the time spent litigating that claim was essential to the presentation of Young's case. This is demonstrably untrue as McCormick was not asked a single question about Young during her trial testimony and thus added nothing to Young's claim. It is not readily apparent that Young's counsel eliminated any time attributable to the unsuccessful prosecution of McCormick's claims, although counsel simultaneously represented to the trial court that time related to McCormick's claim had been excluded from the fee petition. Counsel certainly provided no objective measure to gauge the amount of time deducted from the total as the fee petition never provided a total of all time spent on both Young's and McCormick's claims so that the court could determine whether the resulting hours allegedly devoted exclusively to Young's claims were, in fact, reasonable. And as the reconstructed time records reveal, counsel, in fact, included time solely attributable to McCormick's claim such as preparation of counts in the complaint related to her claims, responses to discovery, drafting jury instructions relating to her claims and the preparation of her motion for a new trial.

¶ 89    Third, the affidavits from Young's counsel in support of the petition contained little detail to support the hourly rates charged for both of Young's lawyers. The affidavit of Jeffrey Friedman, the senior lawyer representing Young, recites that he graduated from the University of Chicago in 1987, had "extensive experience" in civil litigation, including employment litigation and obtained a verdict for $3.25 million for "victims of employment violations" in an unnamed case in an unspecified year in an unidentified forum. Friedman failed to indicate even as to that case what fees, if any, he was awarded and at what hourly rate, information that would have been highly relevant to the $550 hourly rate sought here. The affidavit also failed to include any representation as to what hourly rates Friedman charges in noncontingent matters or, alternatively, that Friedman handles only contingent matters and that such information is not available (although he later testified at the hearing that he handles only contingency cases). The affidavit of Michael Zumwalt, Friedman's associate, recites only that he graduated from law school a little more than one year prior to submission of the petition, had "extensive experience in court, in depositions, and in drafting pleadings, briefs and other papers" and assisted Friedman in an unidentified personal injury case that settled for $1.5 million in 2012. And until defense counsel called it to the court's attention, Young's counsel did not even distinguish between time spent by Zumwalt as a law clerk starting in November 2010 and that spent after he was admitted to the Illinois bar in November 2011. Even then,

Young's counsel proposed only to reduce Zumwalt's rate from $275 to $175 per hour, without any factual support for the contention that the latter hourly rate for the services of a law clerk was reasonable or had ever been approved by any court in any case.

¶ 90    The affidavit of John Billhorn, submitted by Young's counsel to establish market rates for Friedman's and Zumwalt's time, states in conclusory fashion that Billhorn's billing rate in contested employment matters is $525 per hour and that, based on Billhorn's background and experience, Freidman's higher hourly rate and the hourly rate assigned for Zumwalt's time are "fair and reasonable and in the market range." Billhorn does not state what the "market range" is or the factual basis for his conclusion that Young's counsel's rates are in that range. Billhorn was not called to testify at the fee hearing.

¶ 91    Although Young's counsel argued in the trial court that they were not obligated to list every case in which they had been involved in order to substantiate their claim for fees, the dearth of detail they elected to provide (particularly from Friedman, who had been a lawyer for 25 years) weighs heavily against the fees requested and stands in stark contrast to the submission of Young's "special counsel," Krislov & Associates, Ltd., which included details regarding dozens of cases in which the firm had been involved. The memorandum in support of the petition likewise contained scant discussion of fee awards in reported decisions, another yardstick by which fee petitions can be measured.

¶ 92    On the topic of the Krislov firm, Young's counsel ultimately sought more than $74,000 in fees and expenses incurred in that firm's participation in the preparation and presentation of the fee petition, in addition to the time spent by Friedman's firm. Although Friedman took the position in the trial court that the Krislov firm was retained to prosecute the fee petition because Friedman's firm "concentrates in litigation, not fee fights," Friedman and Zumwalt both participated in the fee hearing, conducting examinations of each other, Clinton Krislov and the witnesses called by Alden Gardens. Both firms billed for time spent in preparation for the hearing, at the hearing and in connection with posthearing submissions.

¶ 93    Complicating matters further, the trial court felt it was bound to conduct an evidentiary hearing on the fee petition despite the fact that Alden Gardens did not request one. The trial judge interpreted *Trossman v. Philipsborn*, 373 Ill. App. 3d 1020 (2007), as mandating an evidentiary hearing, a misconception that we discuss below. But even though Alden Gardens disclaimed a desire for the hearing, its counsel treated it like another trial complete with its own set of requests for discovery, motions *in limine*, motions to disqualify counsel and complaints of violations of Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007). Alden Gardens' efforts were met with like maneuverings by Young's counsel. Our examination of the transcript of the protracted hearing reveals that a substantial portion of the testimony focused not on the reasonableness of the time spent, but on legal issues such as whether the witnesses believed the fee petition comported with controlling case law or the trial court's standing order or whether the fees of the Krislov firm were recoverable. The one witness whose testimony did focus on an analysis of the time spent by Young's counsel–one of the attorneys for Alden Gardens–was later disqualified from serving as Alden Garden's counsel (based this time on a motion by Young's counsel) and her testimony was later stricken for reasons not readily apparent. We can say categorically that the evidentiary hearing that was conducted in this case was, by and large, unnecessary and produced little in the way of information relevant to assessing the reasonableness of the fees and costs sought.

¶ 94      In light of all of the foregoing issues, it is no wonder that the trial court ultimately calculated the fees and costs it deemed reasonable under a method that, while unorthodox, produced an award the court believed was justified. We see no basis to reverse or modify that award.

¶ 95      We first address Alden Garden's contention that the fees Young may recover are limited to the amount of the fee called for in her contingent fee agreement with her attorneys. Section 30 of the Whistleblower Act provides that if an employer takes any action against an employee in violation of section 20, the employee may bring a civil action against the employer "for all relief necessary to make the employee whole, including but not limited to the following, as appropriate": (1) reinstatement; (2) back pay; and (3) "compensation for any damages sustained as a result of the violation, including litigation costs, expert witness fees, and reasonable attorney's fees." 740 ILCS 174/30(3) (West 2010). Alden Gardens argues the trial court erred in calculating the attorney fees awarded to Young's counsel on a *quantum meruit* basis where the Whistleblower Act's fee provision limits awards to the sum necessary to make the employee whole. Alden Gardens further contends that if, as the record reflects, Young's counsel agreed to handle the case on a contingency basis, then an award equal to the amount of the contingent fee will make Young whole. In her cross-appeal, Young argues that courts have declined to limit fee awards under fee-shifting statutes to the amount of a contingent fee, and the only question at issue here is what fees are "reasonable." See *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 51 (under fee-shifting provision allowing recovery of "reasonable attorney fees," court was not limited to hourly rate plaintiff's counsel agreed to charge, but could calculate fees at a higher hourly rate as warranted by evidence regarding the prevailing market rate).

¶ 96      The parties' divergent views require us to interpret section 30's provision for "reasonable attorney's fees." We start from the general proposition that in the absence of a statute or agreement, attorney fees are not recoverable by a prevailing party. *International Federation of Professional & Technical Engineers v. Chicago Park District*, 349 Ill. App. 3d 546, 551 (2004). Therefore, any statute allowing the recovery of attorney fees must be strictly construed as it is in derogation of the common law. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 64. The proper interpretation and application of the attorney fee provision of section 30 of the Whistleblower Act is a question of law, which we review *de novo. DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006).

¶ 97      The primary objective in interpreting a statute is to ascertain and give effect to the intent of the legislature, and the most reliable indication of legislative intent is the language of the statute, given its plain and ordinary meaning. *Id.*; *Lucas v. County of Cook*, 2013 IL App (1st) 113052, ¶ 27. When the language of the statute is clear and unambiguous, it should be enforced as written without resort to statutory construction aids. *DeLuna*, 223 Ill. 2d at 59. Our ultimate duty, of course, is to avoid a construction that would defeat the statute's purpose or yield absurd or unjust results. *In re A.P.*, 179 Ill. 2d 184, 195 (1997); *Krautsack v. Anderson*, 223 Ill. 2d 541, 558 (2006).

¶ 98      Few Illinois courts have construed the Whistleblower Act since its enactment in 2004. In *Averett v. Chicago Patrolmen's Federal Credit Union*, No. 06 C 4606, 2007 WL 952034, at *3 (N.D. Ill. Mar. 27, 2007), the federal district court considered whether an employee could recover punitive damages for a violation of section 20. Finding the limiting language of the Whistleblower Act's damages provision unambiguous, the district court concluded that

punitive damages could not be recovered as they were not necessary to make the plaintiff whole. *Id*. ("The plain meaning of 'make whole' allows for compensation of loss to return the plaintiff to [her] former condition, but not for recovery of punitive damages."); see also *Hasler v. Industrial Comm'n*, 97 Ill. 2d 46, 52 (1983) (to "compensate" and to "make whole" are synonymous).

¶ 99       If we extended *Averett*'s reasoning to Young's ability to recover reasonable attorney fees, it would lead to the conclusion that the amount necessary to make Young whole is the amount she obligated herself to pay her attorneys in the contingent fee agreement because presumably that is the only fee she is obligated to pay. But to apply this literal interpretation to section 30's provision for reasonable attorney fees would seriously undermine the ability of employees who suffer retaliation at the hands of their employers to obtain counsel willing to pursue such claims. As this case illustrates, litigation involving claims under the Whistleblower Act is generally hotly contested, complicated and protracted. The prospect of recovering as a fee a percentage of any damages awarded to the employee under the Act, particularly if punitive or exemplary damages are not recoverable, would do little to entice competent counsel to undertake an individual employee's representation. Conversely, few individual employees can afford to hire counsel working on an hourly basis. Thus, were we to adopt Alden Gardens' interpretation of the attorney fee provision of section 30, it would lead to an unjust result at odds with the legislature's purpose to protect employees from adverse employment actions in retaliation for reporting or refusing to engage in unlawful conduct by their employers.

¶ 100      By the time the Whistleblower Act was enacted in 2004, there was a substantial body of law allowing the recovery of reasonable attorney fees under fee-shifting statutes in a variety of contexts. See, *e.g.*, *Blanchard v. Bergeron*, 489 U.S. 87 (1989) (federal civil rights action under 42 U.S.C. §1988); *Berlak v. Villa Scalabrini Home for the Aged, Inc.*, 284 Ill. App. 3d 231 (1996) (fees recovered under the Nursing Home Care Act (210 ILCS 45/1-101 *et seq.* (West 1994)); *Rackow v. Human Rights Comm'n*, 152 Ill. App. 3d 1046, 1064 (1987) (recognizing that award of $4,644.75 in attorney fees when the party discriminated against recovered only $300 in damages was "necessary to ensure proper representation of complaints before the Human Rights Commission and to enforce the important public policies in the Illinois Human Rights Act"). In *Berlak*, this court recognized that the fee-shifting provision in the Nursing Home Care Reform Act was "designed to encourage nursing home residents to seek legal redress against nursing homes for violations of their rights" and that without the ability to recover a reasonable fee, "it is unlikely that attorneys would be adequately remunerated for their successful efforts." *Berlak*, 284 Ill. App. 3d at 236. A similar purpose underlies section 30's fee provision. Thus, we cannot assume the legislature, in providing for the recovery of "reasonable attorney's fees" in the Whistleblower Act as an element of a prevailing plaintiff's damages, intended to depart from these longstanding authorities and provide counsel representing plaintiffs under the Act only a limited ability to recover fees. We therefore reject outright Alden Gardens' contention that counsel's recovery is limited to the amount of their contingent fee.

¶ 101      We next turn to a discussion of what fee is "reasonable" under the circumstances of this case. Both Alden Gardens and Young challenge the trial court's calculation of the allowable amount of the fees and costs–Alden Gardens claiming that even if Young is not limited to recovering the amount of her contingent fee, the award is too high, while Young contends the award is too low. Young further contends that the trial court's adoption of a *quantum meruit*

approach to the fee award is contrary to the Whistleblower Act's authorization of a "reasonable" fee. Finally, Young contests the trial court's disallowance of (i) certain categories of costs, including certain litigation costs and mediation fees incurred posttrial and (ii) the fees of additional counsel brought in to litigate the fee petition. Young requests either that we award her counsel all of the fees sought or, alternatively, remand the matter to the trial court for "a more realistic assessment of the time spent on this unusual case." We decline to do either.

¶ 102    The standards applicable to a court's award of attorney fees, whether under a fee-shifting provision of the statute or under the terms of a contract, are well established. In determining whether the fee sought is reasonable, courts assess a number of factors, including "the skill and standing of the attorneys, the nature of the case, the novelty and/or difficulty of the issues and work involved, the importance of the matter, the degree of responsibility required, the usual and customary charges for comparable services, the benefit to the client [citation], and whether there is a reasonable connection between the fees and the amount involved in the litigation." *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 984 (1987); see also *J.B. Esker & Sons, Inc. v. Cle-Pa's Partnership*, 325 Ill. App. 3d 276, 283 (2001); Ill. R. Prof. Conduct (2010) R. 1.5(a) (eff. Jan. 1, 2010) (prohibiting lawyers from charging unreasonable fees and specifying factors governing determination of reasonableness). A properly supported fee petition must specify the services performed, by whom, the time expended and the rate charged. *Kaiser*, 164 Ill. App. 3d at 984. The party seeking fees bears the burden of presenting sufficient evidence to support a determination that the fees sought are reasonable. *Id.* at 983.

¶ 103    One of the most critical components of a fee petition is detailed entries describing services rendered based on records "maintained during the course of the litigation containing facts and computations upon which the charges are predicated." *Id.* at 984. The failure of counsel seeking fees to maintain contemporaneous time records hinders the court's ability to determine whether the claimed time spent is reasonable:

> "The failure to maintain contemporaneous records of the time spent rendering services greatly increases the difficulty in determining a proper fee. [Citation.] However, estimates can properly be considered by the court [citation], although they are clearly more susceptible to error, and thus more suspect than more properly maintained time records [citation]." *In re Marriage of Malec*, 205 Ill. App. 3d 273, 291 (1990).

¶ 104    In a fee-shifting case, the fact that the amount of the fees sought exceeds the client's recovery, even by a large margin, does not, standing alone, justify rejection of the amount sought. See *Verbaere v. Life Investors Insurance Co. of America*, 226 Ill. App. 3d 289, 302 (1992) (approving $31,500 in fees incurred in connection with recovery of $10,000); *City of Riverside v. Rivera*, 477 U.S. 561 (1986) (approving $245,000 fee on recovery of $33,350 in civil rights case). Rather, the size of the fee in relation to the benefit to the client and, in the context of this case, the purpose to be served by the statutory fee-shifting provision, are relevant considerations in the trial court's determination of a reasonable fee. *Verbaere*, 226 Ill. App. 3d at 300 ("Keeping fee awards in line with the amount of a recovery may be a valid ideal, particularly in purely private disputes. In cases involving section 155 of the Insurance Code, however, courts have recognized that insurance companies, with their superior financial resources, may drag out the claims process to discourage claimants. Therefore, if the insurer vexatiously delays or rejects legitimate claims, it must bear the expense resulting from the insured's efforts to prosecute the claim.").

¶ 105    Generally, we review a trial court's award of attorney fees and costs for an abuse of discretion (*Kaiser*, 164 Ill. App. 3d at 984) and we believe that is the appropriate standard of review here. Given the trial court's decision to conduct an evidentiary hearing on the fee petition, we could quibble whether we should apply a manifest weight of the evidence standard to any findings based on the evidence adduced at the hearing. See *Wildman, Harrold, Allen & Dixon v. Gaylord*, 317 Ill. App. 3d 590, 598 (2000) (in case where law firm sued former client to recover fees, court concluded that "as in any other civil breach of contract action, we hold that the sole question on review is whether the trial court's judgment for attorney fees and costs was against the 'manifest weight of the evidence.' [Citation.]"). But the hearing in this case produced few, if any, relevant findings of fact and given our ultimate conclusion regarding the propriety of the fee award, the standard of review is not determinative.

¶ 106    Applying the foregoing standards to the fee request in this case, we cannot say the trial court's award either constituted an abuse of discretion or is contrary to the manifest weight of the evidence. First, we reject Alden Gardens' argument that the award is excessive. Counsel for Alden Gardens chose to aggressively litigate this case, raising virtually every conceivable issue, often more than once. The relatively modest amount of the fee award is due primarily to defects in the fee petition and not because the fees sought were obviously excessive. Although Alden Gardens presented expert testimony at the fee hearing that supported a lower hourly rate, the trial court was not obligated to accept this testimony. We find no basis in the record to further reduce the award.

¶ 107    As to Young's claim that the award is too low, we have discussed at length above the many shortcomings in the fee petition filed by Young's counsel. Considered individually, those defects, such as the failure to maintain contemporaneous time records or the bundling of services in single time entries, would each warrant reductions in the amount sought. But the plethora of defects ranging from the lack of detail in counsel's affidavits, to the inclusion of time spent on McCormick's claims and charging attorney hourly rates for nonlegal tasks mandated the careful scrutiny the trial court gave the fee request and the reductions it deemed necessary to arrive at a reasonable fee. Indeed, we can say without hesitation that had the trial court approved the fees and costs requested without a substantial reduction it would have constituted an abuse of discretion.

¶ 108    The specific issues Young raises regarding the fee calculation merit only brief discussion. Young contends that the trial court's computation of 187 hours as the reasonable amount of time that should have been devoted to litigation of Young's claims is arbitrary. But Young's counsel persist in refusing to acknowledge that, at a minimum, a 50% reduction in the hours claimed was warranted due to McCormick's lack of success on her claims, particularly because the time records submitted by counsel rendered it impossible to distinguish between time spent on Young's and McCormick's claims. Given the position counsel took in the trial court that evidence regarding McCormick's claims was essential to the prosecution of Young's claim (a position that was indefensible, as noted above), the trial court was justified in assuming that counsel had not attempted to exclude time related to McCormick's claims and reduced the time claimed accordingly. Thus, the reasonable baseline hours are not the 566 hours claimed, but 283 hours. Further, we will not second-guess the trial court's further reductions to account for the fact that the time was reconstructed, entries were bundled, administrative tasks were billed by lawyers and the like. And we believe the trial court

correctly observed that although the case was aggressively litigated (inordinately so), it was not particularly difficult or complex.

¶ 109     We acknowledge the importance of the litigation apart from the resolution of Young's individual claim. Young's (and McCormick's) complaints brought to light violations of the law at Alden Gardens that threatened residents' health and well-being. Young's claim under the Whistleblower Act involved precisely the type of retaliation the act was designed to redress. And had Young's counsel presented the trial court with a well-documented fee petition, the public interest served by pursuit of the litigation may well have justified a higher award. But this factor, standing alone, cannot offset the insurmountable deficiencies in the fee petition discussed above.

¶ 110     Young also contends the trial court abused its discretion in refusing to include in the award the fees and expenses of the Krislov firm. The trial court allowed recovery of 20 hours spent by Young's counsel in preparation of the fee petition and in connection with the hearing. We believe this amount is reasonable. Young cites no authority for the proposition that a trial court abuses its discretion in denying the fees and expenses of additional counsel brought in to litigate an attorney fee petition. Indeed, this is just another example of the overkill approach to this litigation. While attorneys pursuing a fee petition sometimes require affidavits from other attorneys to substantiate market rates and the reasonableness of the hourly rates sought, Young's counsel has not cited any reported case in which a court has awarded not only fees incurred by litigation counsel to prepare and prosecute the fee petition, but fees on top of those fees charged by an entirely separate law firm. And here, where the work of the Krislov firm clearly duplicated that of Young's counsel who actively participated in every phase of the fee hearing, the trial court properly refused to require Alden Gardens to pay the fees of additional counsel.

¶ 111     Finally, Young challenges the trial court's calculation of recoverable costs. The trial court awarded $820 in costs consisting of the circuit court's filing fees of $640 and fees charged by the Cook County sheriff totaling $180. The trial court also allowed the sum of $2,400 for Krislov's testimony at the fee hearing. Young contests the disallowance of other costs including court reporter, subpoena and photocopying fees and unspecified costs labeled "transportation" and "miscellaneous." With the exception of the latter two categories, costs for obtaining transcripts and those associated with the attendance of witnesses at depositions and trial would normally be recoverable as reasonable litigation expenses. But, as we have noted, Young's counsel failed to supply invoices for any expenses so that the court could fulfill its function to determine to whom the claimed amounts were paid and for what litigation-related purpose. Thus, the trial court did not abuse its discretion in limiting recoverable costs to those of which it could take judicial notice, *i.e.,* the court's filing fee and the sheriff's fee for service of process.

¶ 112     We noted above the trial court's misconception that it was obligated to conduct an evidentiary hearing on the fee petition, despite the fact that Alden Gardens did not request one. The hearing, as we have discussed at length, unnecessarily complicated the issue, prolonged the litigation and consumed an inordinate amount of judicial time. The conduct of the parties in connection with the hearing best illustrates why hearings on fee petitions must be conducted in a manner that avoids allowing the issue to effectively become a separate lawsuit.

¶ 113     We take this opportunity to observe that trial courts faced with fee petitions need not conduct evidentiary hearings as a matter of course. We do not read *Trossman* as requiring a

hearing in every case. *Trossman*, 373 Ill. App. 3d at 1057 ("[W]hen the [party against whom fees are sought] asks for an evidentiary hearing, *provided there exists a genuine factual dispute as to the reasonableness of the fees and costs*, he is entitled to one." (Emphasis added and internal quotation marks omitted.)). To the extent it can be so interpreted, we disagree. Rather, a fee petition warrants an evidentiary hearing only when the response of the party to be charged with paying the award raises issues of fact that cannot be resolved without further evidence. See *Williams v. American Country Insurance Co.*, 359 Ill. App. 3d 128, 142 (2005) (rejecting insurance company's argument that evidentiary fee on fee petition under section 155 of the Insurance Code was required: "The trial court presided over this matter for four years and had before it the parties' briefs and [the] petition for attorney fees, as well as the affidavits submitted by [plaintiff's counsel] detailing their involvement in his representation. American Country fails to show what evidence the trial court was lacking when it made a determination regarding [plaintiff's] petition pursuant to section 155.").

¶ 114    For example, the hourly rates charged by counsel should generally not require an evidentiary hearing because the petition itself should contain information supporting the rate requested in the form of (i) an attestation by counsel of the rates charged in other, noncontingent matters and/or fee awards received in other similar litigation, (ii) affidavits of other attorneys in the field attesting to the range of market rates for attorneys of comparable skill and experience, and (iii) a discussion of awards in other reported cases. Information to counter requested rates is likewise available to opposing parties. A trial court's decision regarding what hourly rate should apply is rarely guided by credibility determinations made during an evidentiary hearing. Similarly, where, as here, the trial judge considering the fee petition presided over the litigation from its inception, the judge can draw on that knowledge to determine whether the time sought by petitioning counsel is reasonable without hearing testimony regarding how much time was spent drafting the complaint, propounding discovery, researching the law and preparing for trial. That determination is aided and informed by an opposing party's analysis of time records submitted. While, as a general proposition, we do not believe it appropriate for a trial court, in the absence of adequate support for the lodestar requested (number of hours reasonably expended multiplied by a reasonable hourly rate), to adopt a blended rate and calculate its own total of time reasonably spent, we cannot fault the trial court's resort to that rough justice under the unique circumstances of this case.

¶ 115    That Young's counsel would have fared no better under a more traditional analysis is easily illustrated. We have previously found that substantial reductions in the compensable hours included in the petition were warranted for a variety of reasons. Friedman sought a total of 210.15 hours at the rate of $550 per hour. Discounts for the inclusion of time spent on McCormick's claims, the lack of contemporaneous time records, block billing, lack of specificity in the description of services rendered and duplication of effort would easily reduce that total by half, producing a total time of 105 hours. Applying Billhorn's hourly rate of $525 per hour (which is generous in light of (i) the testimony presented by Alden Gardens at the hearing regarding hourly rates and (ii) the fact that neither Billhorn nor Friedman offered any justification for a higher hourly rate for Friedman) produces a total fee of $55,125. Zumwalt claimed a total of 330.55 hours. Fifty-four hours of Zumwalt's time were spent as a law clerk. While law clerk time can be compensable, it is incumbent on the petitioner to support a reasonable hourly rate for that time. See *Krislov v. Rednour*, 97 F. Supp. 2d 862, 870 (N.D. Ill. 2000) (refusing to include law clerk time in fee award based on plaintiff's failure to disclose

that individual rendering services was not admitted to bar). Krislov's testimony at the fee hearing that $175 was an appropriate fee to charge for the services of a law clerk appeared to be plucked from thin air. Apart from the unsupportable proposed hourly rate of $175 for Zumwalt's clerk time, Young's counsel offered no other evidence as to a reasonable hourly rate for a law clerk, although reported decisions and other authorities are available. See, *e.g.*, Alba Conte, Attorney Fee Awards, ch. 2, § 11:16 (3d ed. 2014) (chart cataloging fee awards in employment-related cases, including amounts awarded for law clerks and paralegals). It was certainly not the trial judge's obligation to search out support for this element of Young's fee petition and, therefore, he could properly have refused to include Zumwalt's law clerk time at all in the calculation, resulting in a revised total for Zumwalt of roughly 277 hours. Applying the same discount to Zumwalt's hours as that applied to Friedman's produces a total of 138.5 hours. The hourly rate of $275 sought for a first-year associate is clearly too high and again other than the conclusory statement in Billhorn's affidavit and Krislov's equally conclusory testimony at the hearing, there is no support in the record for this hourly rate. Certainly there is nothing in the record to support the conclusion that a first-year associate in a two-person firm could command $275 per hour for his services. Based on reported authorities, a more realistic rate would appear to be $150 per hour. See, *e.g.*, Conte, *supra*, ch. 4, § 29:1 (chart cataloging market hourly rates by federal circuit). Applying this rate to Zumwalt's reduced time produces a total of $20,775, which, when added to Friedman's fee, would have produced a total fee award of $75,900. Thus, the claimed errors in the trial court's calculation of a reasonable fee raised by Young had no significant effect on the outcome and we will not remand this matter so that the trial court can repeat this exercise.

¶ 116    Normally, we would remand this matter to the trial court to determine the fees to which Young is entitled for her defense of Alden Gardens' appeal. But the course this litigation has taken to date convinces us that we should resolve the issue of reasonable fees on appeal. To that end, counsel for Young is directed to file, within 21 days of the date of this opinion, a supplemental fee petition limited to the fees and expenses for which they seek compensation on appeal. A memorandum of no more than 10 pages may be filed in support of the supplemental petition. We caution counsel that the supplemental petition must comport with the standards for fee petitions that we have reiterated in this opinion. We further note that two firms have appeared for Young on appeal. The supplemental petition must specifically delineate the time spent by both firms and identify what time has been eliminated due to inevitable duplication of effort. Counsel should also indicate the amount of time that was excluded because it was devoted to Young's cross-appeal, which is not compensable. Alden Gardens shall have 21 days to file a memorandum of no more than 10 pages in response to the supplemental petition; Young shall have 14 days to file a reply of no more than five pages. The time for filing any petition for rehearing under Illinois Supreme Court Rule 367 (eff. Dec. 29, 2009) is stayed pending entry of an order on the supplemental fee petition.

¶ 117                                    CONCLUSION
¶ 118    The judgment entered on the jury's verdict in favor of Young is affirmed. The trial court's award of attorney fees and cost award is affirmed. The effective date of this opinion is stayed pending entry of the order on the supplemental fee petition.

¶ 119    Affirmed.